

**IN THE COURT OF CRIMINAL APPEALS
OF TEXAS**

PD-134-07

**LYDIA H. GROTTI, Appellant**

v.

**THE STATE OF TEXAS**

**ON STATE'S PETITION FOR DISCRETIONARY REVIEW
FROM THE SECOND COURT OF APPEALS
TARRANT COUNTY**

JOHNSON, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. KELLER, P.J., dissented.

O P I N I O N

On October 13, 2003, the state indicted appellant, Lydia Grotti, a former physician at John Peter Smith Hospital (JPS) in Fort Worth, for murder.[1] The indictment alleged that appellant caused the death of her patient, Lettie McGhee (McGhee) by occluding McGhee's endotracheal tube (ET tube) with her finger. The jury acquitted Grotti of murder, but convicted her of the lesser-included

---

[1] Appellant was one of two attending physicians in the JPS Intensive Care Unit on the night in question. At the time of the event, appellant was board certified in both internal medicine and critical care.

offense of criminally negligent homicide, a state-jail felony.[2]  The jury also found that appellant used her finger as a deadly weapon.  The trial court assessed punishment to two years' imprisonment.

Appellant timely filed a notice of appeal to the Second Court of Appeals.  On appeal, appellant argued that the evidence was insufficient to demonstrate that McGhee was alive at the time appellant occluded McGhee's ET tube and that appellant thereby caused McGhee's death.  The court of appeals agreed with appellant, reversed the trial court's judgment, and remanded the case for a new trial.  *Grotti v. State,* 209 S.W.3d 747 (Tex. App.—Fort Worth 2006).  The court held that, because the meaning of death was not sufficiently defined under the Texas Penal Code,[3] it was required to interpret the meaning of death as it would appear in a hypothetically correct jury charge, i.e. as defined under section 671.001 of the Health and Safety Code.[4]  *Id.* at 759-62.  It stated that the technical meaning of death was critical in deciding whether McGhee was dead or alive when appellant occluded the ET tube.  After its analysis, the court concluded that the evidence was legally sufficient, but factually insufficient, to adequately prove that McGhee was alive when appellant occluded McGhee's ET tube.

We granted the state's petition for discretionary review.  The state asserts in three grounds that: (1) "the court of appeals erred in its sufficiency analysis by applying a definition from outside the penal code to an element of the offense, which was not defined within the penal code and not included in the jury charge"; (2) "the court of appeals applied an incorrect standard of review to its

---

[2] A person commits criminal homicide if he intentionally, knowingly, recklessly, or with criminal negligence causes the death of an individual.  TEX. PENAL CODE § 19.01(a).  A person commits an offense if he causes the death of an individual by criminal negligence.  TEX. PENAL CODE § 19.05(a), (b).

[3] TEX. PENAL CODE § 1.07(a)(49).

[4] TEX. HEALTH & SAFETY CODE § 671.001(a).

factual sufficiency review, by affording no deference to the jury's credibility determination"; and (3) "this case illustrates that the dissenting opinions in *Watson v. State,* 204 S.W.3d 404 (Tex. Crim. App. 2006), were correct: Clewis should be abandoned." *See Watson* 204 S.W.3d at 421 (Cochran, J., dissenting) (noting that factual-sufficiency analysis should be abandoned, thereby returning to a single standard of review for sufficiency of evidence in a criminal case, as set out in *Jackson v. Virginia,* 443 U.S. 307 (1979).

**Facts**

For approximately two weeks McGhee, a sixty-four-year-old woman, had complained of having constant abdominal and urinary pains, coughing, and nausea. She first went to JPS's emergency room (the ER) on December 24, 2000, and remained there into the next day. Based on the radiology report and various exams, physicians diagnosed McGhee as having advanced metastatic ovarian cancer that had spread to her liver, lungs, and, bones. JPS, however, discharged McGhee on December 25, 2000.

The following day, McGhee returned to the ER with breathing problems. After waiting in the ER for approximately two hours, McGhee lost consciousness. Her daughter immediately notified Leigh Taylor, the emergency medical technician (EMT) on duty, that she needed help because something was wrong with her mother. Taylor looked into the waiting room and observed McGhee slumped over in the wheelchair. Taylor then checked McGhee's wrist, but found no pulse. Taylor, the triage nurse, and a male tech transported McGhee to trauma room 1 to begin a "code."[5]

The code team began full Advanced Cardiac Life Support (ACLS) at 19:48. They attached

---

[5] A definition of "code" was offered by the state's medical expert, Janice Zimmerman, M.D.; "[I]n simplified terms you have a patient who has a condition that if you don't do something they probably are likely to die. But you have an opportunity to intervene and reverse that process or treat it effectively."

McGhee to an electrocardiogram monitor to determine her heart rhythm, which was noted at that time as ventricular fibrillation (V-fib).[6] The code team administered at least fifteen defibrillations over the course of the entire code. Dr. Eli, the first doctor to respond to the code, intubated McGhee at 19:57. At this point, McGhee had no detectable blood pressure or pulse and took no spontaneous respirations. She was given multiple doses of drugs that stimulate heart function. At 20:08, the code sheet showed that McGhee's rhythm was "asystole," indicating an absence of any electrical activity in the heart. At 20:16, the code team detected a pulse and a heart rate of ninety beats per minute. McGhee's heart established a sinus rhythm[7] at 20:18, and she was put on a ventilator.

Once McGhee exhibited a sinus rhythm, Dr. McGraw[8] called appellant regarding McGhee's admission into the Intensive Care Unit (ICU). Shortly thereafter, appellant arrived at the ER. At about that time, McGhee lost both a sinus rhythm and a pulse. According to Dr. McGraw and other witnesses, appellant stood at the foot of the bed without making a physical assessment of McGhee's condition and asked how long the code had been running. Dr. McGraw responded that they had been running the code for approximately forty-five minutes. Appellant then stated that McGhee had "lost any chance at recovery" and that she was "either brain dead or that she would probably be pronouncing McGhee brain dead the next morning or within twenty-four hours." Appellant determined that McGhee was not stable enough for transfer to the ICU and instructed McGraw to call her if McGhee became stable. Appellant went back to the ICU.

---

[6] According to Doctor Zimmerman, ventricular fibrillation is "an irregular rhythm of the heart[;]it just sits there and basically quivers."

[7] A sinus rhythm is a normal heart rhythm. According to Dr. Cox, although a sinus rhythm suggests a pulse and a heartbeat, it does not demonstrate that the heart is effectively pumping blood to the body.

[8] Dr. McGraw, a state witness, assumed care of McGhee upon his arrival in the trauma room.

Dr. McGraw continued the code. McGhee regained a sinus rhythm, a pulse, and a heart rate. The code team performed an EKG test on McGhee and confirmed the heart beat and sinus rhythm. Shortly before 20:50, Dr. McGraw called appellant back to the ER to reassess McGhee's condition, and upon her return, appellant assumed care of McGhee. Dr. McGraw left the trauma room to attend to other patients.

According to appellant's testimony, she assessed McGhee and concluded that McGhee lacked a blood pressure and both radial and femoral pulse. Appellant did, however, detect a carotid pulse, but described it as "thready," which she defined as meaning "weak." She stated that the pulse had "gone away" prior to her reporting this detection to the code team. At 20:50, appellant called the code,[9] discontinued the IV and ventilator, and pronounced McGhee dead. Appellant testified that McGhee had no pulse, no spontaneous respirations, and no blood pressure. Nevertheless, appellant wrote on the code sheet that at 20:50 that McGhee had a "brady"[10] rhythm, a palpable pulse, and a heart rate in the sixties. Appellant explained that she wrote "brady" because McGhee's heart rate was "bradying down" or "slowing down."

Nurse Lovins, however, testified that she saw McGhee still breathing moments after appellant called the code. She observed McGhee's "chest rising and falling, and saw condensation in the ET tube." EMT Taylor also testified that she saw McGhee taking normal breaths, condensation in the ET tube, and heart activity on the EKG monitor. EMT Short also believed that McGhee was breathing. After appellant called the code, Short saw McGhee's chest "rising and falling" for

---

[9] "Calling the code" means stopping all attempts to resuscitate the patient; the code had lasted for approximately one hour.

[10] "Brady" is short for "bradycardia," which means a slow heart rate, usually less than sixty beats per minute.

approximately an hour, and she detected a palpable pulse in McGhee's wrist and neck. She also testified that she commented aloud about McGhee having a pulse. She could not, however, definitively state the exact time at which she detected the pulse. She also testified that, after calling the code, appellant instructed her and other members of the code team to "call her when the patient expire[d]" and she would then go talk to McGhee's family. Nurse Martin also testified that she witnessed McGhee's chest rising and falling and condensation in the ET tube. At some point after calling the code, members of the code team notified appellant that McGhee was still breathing.[11]

According to appellant, however, the respirations were "agonal," and McGhee made no attempt to breathe after she called the code. Appellant opined that McGhee was getting air into her central airways, but not into her lungs. She stated that she explained to Nurse Martin that McGhee had been hyperoxygenated and that her brain stem was continuing to fire, causing muscle contractions to open up her airway and move air.

Appellant testified that, after calling the code, she reported McGhee's death to the medical examiner (the ME) at 21:00. Because of McGhee's "agonal activity," appellant asked the ME for permission to remove the ET tube, so that her airway tissues would collapse inward, thereby ending the agonal respirations. However, the ME did not grant permission to remove the ET tube.[12]

Appellant also testified that she subsequently reevaluated McGhee throughout the hour, but there were still no signs of life. She asserted that there was electrical activity on the monitor, but there "weren't heart sounds or pulses," and that with each evaluation, McGhee's respiratory activity

---

[11] Nurse Martin testified that appellant was notified immediately after disconnecting McGhee from the ventilator that McGhee was still breathing and that she still had a pulse. Nurse Martin also testified that appellant was argumentative and non-receptive when informed that McGhee was still breathing.

[12] It was normal procedure that, if a patient died less than 24 hours after being admitted into the hospital, removal was automatically denied.

became slower. Appellant stated that, shortly before 21:50, McGhee's activity had "slowed down to three or four agonal respirations a minute and the heart rate was down in the 20s, maybe mid-20s." She also stated that one of the nurses inquired as to how long this activity was going to continue, and she explained that the duration of the activity could vary because the ET tube was keeping McGhee's airway open. According to appellant's testimony, the nurse then attempted to occlude the ET tube with paper, but appellant stopped her.[13]

Appellant testified that, after the nurse left the trauma room, she revisited the idea of occluding the tube because she knew that it would stop the agonal respirations. Hence, at 21:50, appellant occluded McGhee's ET tube with her finger. Appellant witnessed McGhee's head and neck move while she occluded the tube. Michael Kasschau, M.D., a resident in the ICU, testified that he witnessed appellant occluding the tube and the movement of McGhee's head and neck.[14] Dr. Kasschau asserted that appellant told him that this is something that she had seen done in her fellowship.[15] Nurse Berglund entered the trauma room while appellant was occluding the tube. In disbelief, she asked appellant what she was doing and why, and appellant told her that she was occluding the tube to end McGhee's agonal respirations. Approximately a minute after occluding the tube, McGhee's movement ceased, and the monitor indicated that she was asystolic. There was

---

[13] Testimony of members of the code team neither supported nor contradicted this assertion.

[14] Appellant asserted that Dr. Kasschau was not present when she occluded the tube; however, this assertion conflicts with other parts of appellant's testimony.

[15] When asked at trial, appellant did admit that she told Dr. Kassachau that she had witnessed something in her fellowship, but it did not include occluding a tube.

(By the defense)  Q. What were you describing to him?

A. What I was describing to him was the return of respiratory efforts after a
code was called and the patient was pronounced dead.

no autopsy. McGhee's death certificate listed the cause of death as natural and recorded her time of death as 20:50 on December 26, 2000.

Dr. Kevin Wacasey, M.D., learned about the incident involving appellant and McGhee on December 27, 2000.[16] In March 2001, he made an anonymous phone call to homicide Detective Watters of the Forth Worth Police Department to report appellant's actions. Appellant was subsequently indicted for murder. The trial court included in the jury charge an instruction on criminally negligent homicide, which is the conviction now at issue.

### Standard of Review

In Texas, statutory and constitutional authority grants to the courts of appeals (on direct appeal), and this Court (in capital cases), the power to review claims of factual-sufficiency.[17] *See Watson,* 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Clewis*, 922 S.W.2d at 131-32. This authority allows the appellate court to reverse criminal cases and remand them to the trial court for a new trial if the appellate court finds that the evidence is factually insufficient.[18] *Id.*

An intermediate court, nonetheless, may not simply substitute its judgment for that of the finder of fact. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). The verdict may be set aside only if it is so contrary to the

---

[16] Apparently, Dr. Wacasey had concerns about the manner in which JPS ran its ER. He reported the incident to the Fort Worth police department in March 2001 and was fired by the hospital in July 2001. Dr. Wacasey asserted that he was fired because he notified authorities about Lettie McGhee's death. The defense asserted that he knew that he was in danger of being fired and reported the incident as a way to set up a whistle-blower claim against the hospital.

[17] "Provided, that the decision of said courts shall be conclusive on all questions of fact brought before them on appeal or error." TEX. CONST. art. V, § 6.

[18] "The courts of appeals or the Court of Criminal Appeals may reverse the judgment in a criminal action, as well upon the law as upon the facts." TEX. CODE CRIM. PROC. art. 44.25.

overwhelming weight of the evidence as to be clearly wrong and unjust. *See Watson*, 204 S.W.3d at 414-17 (citing *Clewis,* 922 S.W.2d at 131-32). Such a wrong and unjust verdict includes instances in which the jury's finding is "manifestly unjust, 'shocks the conscience,' or 'clearly demonstrates bias.'" *See Watson*, 204 S.W.3d at 426 (citing *Jones v. State*, 944 S.W.2d 642 (Tex. Crim. App. 1996)); *see also Clewis,* 922 S.W.2d at 135; *Meraz v. State*, 785 S.W.2d 146, 149 (Tex. Crim. App. 1990). An opinion that addresses factual-sufficiency reviews the evidence in a neutral light. *Watson,* 204 S.W.3d at 414. It must include a discussion of the evidence and, if it reverses on factual-insufficiency grounds, it must state clearly why the evidence is factually insufficient. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003); *Goodman v. State,* 66 S.W.3d 283, 287 (Tex. Crim. App. 2001); *Johnson*, 23 S.W.3d at 7. A new trial is not warranted simply because the appellate court disagrees with the verdict in the trial court. *Watson,* 204 S.W.3d at 414.

The factual-conclusivity clause of the Texas Constitution makes an intermediate appellate court's factual-sufficiency decision conclusive and restricts this Court's review to determining only whether the court of appeals used the proper standard and properly applied it. *Roberts v. State,* 221 S.W.3d 659, 663 (Tex. Crim. App. 2007) (citing *Choate v. San Antonio & A.P. Ry. Co.*, 91 Tex. 406, 44 S.W. 69, 69-70 (Tex. 1898)) (holding that purpose of factual-conclusivity clause was to limit the Texas Supreme Court's jurisdiction to questions of law and to make intermediate court's factual-sufficiency decisions conclusive).[19] Thus, review of a direct-appeal court's factual-sufficiency decision by the Court of Criminal Appeals is limited by the factual-conclusivity clause to determining only whether the direct-appeal court properly applied "rules of law." *Roberts,*

---

[19] There are two *Roberts* opinions that discuss the factual-sufficiency standard. The first case, *Roberts v. State,* 221 S.W.3d 659, involved an aggravated robbery conviction. The second case, *Roberts v. State,* 220 S.W.3d 521, involved a capital-murder conviction.

221 S.W.3d at 662.

## The Hypothetically Correct Jury Charge

In *Malik,* we held that legal sufficiency of the evidence would no longer be measured by the jury charge actually given, but that it would instead be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d at 234. *Malik* also held that, when assessing the legal sufficiency of evidence on appeal, the appellate court should measure elements of the offense as defined in a hypothetically correct jury charge for the case. *Id.* at 240. This charge accurately promulgates the law, is authorized by the indictment, does not unnecessarily increase the state's burden of proof or restrict the state's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.; see also Gollihar,* 46 S.W.3d 243, 253 (Tex.Crim.App. 2001). In *Wooley v. State*, __ S.W.3d __ (Tex.Crim.App. 2008), delivered this day, we held that the *Malik* standard also applies to factual sufficiency. Thus, the court of appeals may use a hypothetically correct jury charge to evaluate the factual sufficiency of evidence. We now consider whether the definition of death used by the court of appeals in its factual-sufficiency analysis would have been included in the hypothetically correct charge.

## The Definition of Death

The state asserts that the court of appeals erred in its sufficiency analysis by applying Section 671.001 of the Health and Safety Code's definition of "death," which was not included in the jury charge and was not the definition of death rendered under the penal code. *Grotti,* 209 S.W.3d at 759; *see generally* TEX. HEALTH & SAFETY CODE § 671.001(a); TEX. PENAL CODE § 19.01. The state further asserts that death is not a technical term, and "even if considered technical, it should be given its ordinary meaning if not legislatively defined in the penal code."

As a general rule, terms need not be defined in the jury charge if they are not statutorily defined and jurors may understand them to have any meaning that is acceptable in common parlance. *Medford v. State,* 13 S.W.3d 769, 771-72 (Tex. Crim. App. 2000) (citing *Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992)) (determining what the term "penetration" means in the context of an aggravated sexual assault); *see also Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991). There are exceptions. Terms which have a technical or legal meaning may require an explicit definition. *Middleton v. State,* 125 S.W.3d 450, 454 (Tex. Crim. App. 2003) (citing *Medford v. State,* 13 S.W.3d at 772)). This is particularly true when there is a risk that the jurors may arbitrarily apply an inaccurate definition to the term or where an express definition of the term is required to assure a fair understanding of the evidence. *Ibid.*

In *Medford,* this Court held that the "canons of construction dictate that words and phrases possessing a technical meaning are generally to be considered as having been used in their technical sense." *Medford,* 13 S.W.3d at 772. This applies to those terms that have a known and established legal meaning or that have acquired a peculiar and appropriate meaning in the law. *Id.*

Section 1.05(b) of the Penal Code, titled "Construction," gives guidance as to how we should construe provisions and terms within the penal code. It specifically states that "the provisions of the code shall be construed according to the fair import of their terms, to promote justice, and effect the objectives of the code." *See* TEX. PENAL CODE § 1.05(a). It also refers to the Code Construction Act, which states that "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." TEX. GOV'T CODE § 311.011. It is clear that the legislature did not intend to place rigid restrictions on interpreting a technical term or provision, but rather to provide an appropriate meaning of the term so that it would

provide a clear understanding to its hearer. We must, therefore, look to the best statutory source when determining the most befitting definition of "death" in this case. *See Medford*, 13 S.W.3d at 772.

Under the Texas Penal Code, a person commits a criminal homicide "if he intentionally, knowingly, recklessly, or with criminal negligence causes the death of an individual." TEX. PENAL CODE § 19.01. The offense of criminally negligent homicide requires that "a person . . . cause[ ] the death of an individual by criminal negligence."[20] TEX. PENAL CODE § 19.05(a). The Penal Code defines an individual as "a human being who has been and is alive." TEX. PENAL CODE § 1.07(a)(26). Death, however, is defined in the Penal Code only as it relates to an unborn child not being born alive.[21]

Section 671.001 of the Texas Health and Safety Code, titled, "Standards Used in Determining Death," also defines death. This section provides guidance to physicians, and others relying on a physician's pronouncements, as to when, legally, death occurs. TEX. HEALTH & SAFETY CODE §§ 671.001(a), (b). Section 671.001 states that

> (a) a person is dead when, according to ordinary standards of medical practice, there is irreversible cessation of the person's spontaneous respiratory and circulatory

---

[20] The Penal Code defines criminal negligence as follows:

> a person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE § 6.03(d).

[21] "Death includes, for an individual who is an unborn child, the failure to be born alive." TEX. PENAL CODE § 1.07(a)(49).

functions.

(b) if artificial means of support preclude a determination that a person's spontaneous respiratory and circulatory functions have ceased, the person is dead when, in the announced opinion of a physician, according to ordinary standards of medical practice, there is irreversible cessation of all spontaneous brain function. Death occurs when the relevant functions cease.

TEX. HEALTH & SAFETY CODE §§ 671.001(a), (b).

McGhee's death occurred in a hospital, and the attending physician was accused of intentionally causing that death. The jury had to determine whether McGhee's death, as it is medically defined, occurred before or after appellant occluded the tube. The jury, therefore, should have been instructed to interpret "death" within the medical context.

While the state argues that applying a meaning of death from outside the penal code was error, the record is clear that both the state and the defense used § 671.001's definition of death throughout the trial. In fact, it was the state that introduced this definition into the trial. Before calling its first witness, Mr. Fryer, the lead prosecutor stated, "I'd respectfully ask the Court to take judicial notice of Section 671.001 of the Health and Safety Code, which is the standard used in determining death." The state's request was a concession that, in this case, interpreting death required a more technical meaning than that defined in the Penal Code and that the jury would need a precise, uniform definition to guide its deliberations.

Therefore, the hypothetically correct jury charge, which would have included the definition of death as set out in § 671.001 of the Health and Safety Code, accurately promulgated the law as it pertained to death, was authorized by the indictment, did not unnecessarily increase the state's burden of proof or restrict the state's theories of liability, and adequately described the particular offense for which appellant was tried. The court of appeals appropriately defined death by using

section 671.001 of the Health and Safety Code, rather than the Penal Code's definition of death, in a hypothetically correct jury charge. We overrule the state's first ground.

## Court of Appeals' Deference to the Jury's Verdict

In its second ground, the state argues that the court of appeals applied an incorrect standard of factual-sufficiency review by failing to afford deference to the jury's credibility determinations. The state further asserts that the sole factual determination to be made, whether McGhee was dead or alive at the time of the tube occlusion, was premised on the credibility of expert testimony, and that the court of appeals simply decided to disagree with the jury's credibility assessment. Hence, the state argues that the jury's acceptance of Dr. Zimmerman and Dr. DiMaio's expert testimony that McGhee was alive, rather than the defense's expert witness asserting that McGhee was dead, does not shock the conscience or clearly demonstrate bias. The state's assertions lack support.

In a factual-sufficiency review, the evidence is reviewed in a neutral light. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *accord Johnson v. State*, 23 S.W.3d at 7. Only one question is to be answered in a factual-sufficiency review: Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt? *Watson,* 204 S.W. 3d at 415. Evidence can be factually insufficient in one of two ways: (1) when the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust; and (2) when the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust. *Roberts*, 220 S.W.3d at 524 (citing *Watson*, 204 S.W.3d at 414-15; *Johnson*, 23 S.W.3d at 11); *see also Castillo v. State*, 221 S.W.3d 689, 693 (Tex. Crim. App. 2007). "[A]n appellate court must first be able to say, with some objective basis in the record, that the great weight and preponderance of the . . . evidence contradicts

the jury's verdict before it is justified in exercising its appellate fact jurisdiction to order a new trial." *Watson,* 204 S.W.3d at 417. A reversal for factual insufficiency cannot occur when "the greater weight and preponderance of the evidence actually favors conviction." *Roberts*, 220 S.W.3d at 524. Although an appellate court has the ability to second-guess the jury to a limited degree, the factual-sufficiency review should still be deferential, with a high level of skepticism about the jury's verdict required before a reversal can occur. *Watson*, 204 S.W.3d at 417; *Cain*, 958 S.W.2d at 410. It is not within this Court's authority to conduct our own factual-sufficiency analysis. TEX. CONST. art. V, § 6. We are permitted to evaluate only whether the court of appeals applied the correct rule of law. *Id.* We turn to a review of the evidence under these principles.

### Analysis

A fair reading of the record indicates that the court of appeals' opinion set out the "most important and relevant" evidence, including evidence contrary to the jury's verdict that McGhee was indeed alive when appellant occluded the tube. We find that the court of appeals did a thorough analysis of whether the jury's verdict was against the great weight of the evidence, and that it correctly applied the appropriate legal standard in holding that the evidence presented at trial was factually insufficient to support a guilty verdict.

Although the state asserts that the court of appeals totally disregarded the jury's verdict, this assertion is contrary to the record presented to this Court. The court of appeals diligently reviewed and thoroughly discussed each witness' testimony and other evidence, specifically with respect to the question of whether McGhee was alive or dead at the time of the tube's occlusion.

Sixteen witnesses testified for the state and five for the defense. Of these witnesses, two on each side were qualified as expert witnesses. Fourteen "non-expert" witnesses testified as to what

each had done and seen that day. Of those fourteen, no one was willing to say unequivocally that McGhee was alive at the time appellant occluded the tube.

Both of the state's expert witnesses, Dr. Zimmerman and Dr. DiMaio, gave expert opinion as to whether McGhee was alive before appellant's actions. Dr. DiMaio,[22] however, was the only expert witness who definitively asserted that McGhee was alive when appellant occluded the tube. Dr. Zimmerman testified that appellant's actions were inappropriate, but admitted that her opinion was based on her assumption that McGhee was breathing when the tube was occluded.[23] Both Dr. Cox[24] and Dr. Krucke,[25] the defense expert witnesses, testified that McGhee was unequivocally dead at the time of the occlusion.

The court meticulously explained the reasons for its conclusion that the evidence that McGhee was not alive when appellant occluded the tube so greatly outweighed the evidence that she was alive. Further, the state has never contended that the court of appeals misrepresented or omitted facts from its analysis. Rather, the state has couched its argument in terms of criticism of *Clewis*.[26] We find that the court of appeals appropriately assessed all of the relevant evidence and used the

---

[22] Dr. DiMaio was the chief medical examiner for San Antonio, Bexar County, Texas. He based his opinion that McGhee was alive solely on her medical records and the JPS staff affidavits. He did not see McGhee before or after her death.

[23] Dr. Zimmerman was the director of emergency services at Ben Taub General Hospital in Houston, Texas. Dr. Zimmerman based her opinions on McGhee's medical records, JPS employee affidavits, information from the Board, and letters.

[24] Dr. Cox was an emergency-medicine physician at Harris Methodist Hospital in Fort Worth, Texas. He based his opinion on McGhee's medical records, ACLS guidelines, and the opinions of other experts. He did not see McGhee before or after her death.

[25] Dr. Krucke worked with appellant as a physician in the JPS ICU.

[26] The state's real complaint in this case seems not to be a legal complaint that the court of appeals misapplied "rules of law," but a factual complaint that the evidence of McGhee being dead is greatly outweighed by contrary evidence.

correct standard of review. The state's second ground is overruled.

*Clewis* and the Factual-Sufficiency Standard

In its third ground, the state argues that the courts of appeals' further demonstrates that the dissenting opinions in *Watson* were correct and that *Clewis* should be abandoned. We have consistently declined to dispense with factual-sufficiency review, and the state's arguments do not persuade us to do so now. The state's third ground is overruled.

The judgment of the court of appeals is affirmed.

Filed: June 25, 2008
Publish