TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN





NO. 03-07-00049-CR






Raymond Salazar, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT

NO. D-1-DC-2005-300413, HONORABLE MICHAEL J. MCCORMICK, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N


 Appellant Raymond Salazar appeals his conviction for indecency with a
child by sexual contact. See Tex. Penal Code Ann. § 21.01 (West Supp. 2008), § 21.11(a)(1), (2)
(West 2003). After appellant's plea of not guilty, the jury found him guilty and assessed his
punishment at seven years' imprisonment.


POINT OF ERROR

 Appellant advances one point of error. He challenges the factual sufficiency of
the evidence to sustain his conviction for indecency with a child by sexual contact. No challenge
is addressed to the legal sufficiency of the evidence to support the conviction. On direct appeal a
court must begin its factual sufficiency review with the assumption that the evidence is
legally sufficient under Jackson. (1) Watson v. State, 204 S.W.3d 404, 406 (Tex. Crim. App. 2006);
Clewis v. State, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996); Key v. State, 88 S.W.3d 672, 677
(Tex. App.--Tyler 2002, pet. ref'd).


BACKGROUND

 Anna Allen, a director of the "Pebble Project," testified that her organization
was established to prevent child abuse. On April 3, 2000, her group was presenting a program at
the Burnet Middle School in Austin involving skits on how to handle a bully, stranger danger,
and personal issues (such as sexual abuse). After the skits, forms were passed out to the students that
included a place to check if the student wanted to talk to a volunteer of the "Pebble Project."

 R.S., the complainant in this case, was almost twelve years old at the time. She
checked the form handed out and was interviewed at the school by Anna Allen. In the conversation,
R.S. began to "shake and cry" according to Allen. R.S. revealed to Allen that appellant Salazar was
her stepfather, and he had been touching her private parts since she was six or seven years old. R.S.
also reported that on the previous Saturday, April 1, 2000, she was sleeping on the couch in the
living room when she awakened to find her shorts pulled down, and she "pushed something away." 
R.S. told Allen that she had never told anyone before because "it would ruin everything." Allen filed
a report with the Child Protective Services (hereinafter CPS).

 Teri Reynolds Freeman, a CPS investigator, testified that she interviewed R.S.
at school on April 4, 2000, and met with members of R.S.'s family. Freeman instituted a "safety
plan" requiring appellant to leave the home, and have no unsupervised contact with the
children--R.S., her younger brother, and appellant's own child.

 Austin police detective Johnny McMiller contacted R.S.'s mother, Suzanne Salazar,
on April 11 and 12, 2000. Mrs. Salazar expressed her concern over the family's financial situation
with her husband living elsewhere. Mrs. Salazar informed the officer that R.S. had been recently
disciplined over an incident and was angry with appellant, and that if the alleged touching
occurred on April 1, 2000, (2) it could not have happened because R.S. spent that night at her
grandmother's house. She further told Detective McMiller that R.S. had changed her mind. 
Detective McMiller felt that Suzanne was "in denial" and concerned that the situation was
undermining her marriage to appellant.

 On April 17, 2000, R.S. was taken to the Child Advocacy Center in Austin for a
videotaped interview. In that interview, R.S. stated that she thought that she only dreamed about
the sexual contact. After the interview, Detective McMiller met with an assistant district attorney
who declined under the circumstances to prosecute appellant. Teri Freeman conferred with her
supervisor, and appellant was allowed to return home. The case was closed.

 Over four and a half years later, on November 29, 2006, Jennifer Pena, an investigator
with CPS for one year, was assigned a case involving M., R.S.'s then fourteen-year-old brother. This
inquiry apparently concerned a physical assault by appellant upon M. (3) During this investigation,
Pena decided to interview R.S. about her earlier allegations in 2000. Pena testified that R.S., now
sixteen years old, became nervous but admitted that her earlier allegations were true. R.S. reported
that her mother had earlier told her to lie. R.S. later gave a videotaped interview at the Child's
Advocacy Center relating her allegations. The case was reopened. An indictment was returned on
March 17, 2005. On July 28, 2006, R.S. filed an affidavit of non-prosecution. Nonetheless the trial
was conducted on October 16, 17, 18, and 19, 2006.

 At trial, the now eighteen-year-old R.S. testified that she was in high school and lived
with her mother and the mother's boyfriend, her brother, and her half-sister. She did not know where
her own biological father was, that he had "been in and out of jail for not paying child support." She
acknowledged that appellant came into her life when she was two or three years old and later married
her mother. The "touching" of her private parts began when she was six or seven years old. "It
didn't happen often. Just every once in a while." R.S. stated that it occurred about ten times, and
stopped after she reported it at school to the Pebble Project when she was almost twelve years old. 
R.S. did not remember the first touching but related three incidents that she could recall. In one
incident, date unknown, R.S. testified that she heard a noise and woke up, and that appellant got into
a twin bed with her next to the wall while she faced the other way. R.S. related that appellant put
his arm around her and touched the lower area--the private part of her body. The record reflects:


 Q. What do you use that private area for?


 A. Sex.


 Q. Okay, is it also called a vagina?


 A. Yes.


 R.S. remembered that she was wearing panties and pajamas. She could not recall
whether appellant touched her under her clothing or on the outside of such clothing. She stated that
he "just rubbed it. There was no inserting." She thought it lasted ten minutes but was not sure.

 When reminded, R.S. also recalled another incident, some time closer to her outcry
at school. She stated that one night she and her brother were sleeping on different couches in the
living room when she suddenly awakened, and found appellant standing right in front of her. She
was "shocked," but appellant turned and left the room. When directly asked, R.S. said appellant was
actually kneeling at the couch, and when he left, she then found her shorts were unbuttoned.

 Upon being reminded again, R.S. told of another incident when she and her brother
were playing video games in the living room and her mother was in the kitchen. She described
appellant as being "under the covers." She related that she got cold and appellant covered her with
blankets and in the process touched her private parts. When asked if she told her mother about these
incidents, R.S. stated "sometimes," but she retracted that, and then she denied informing her mother
because she would not have believed her.

 R.S. testified that after her 2000 outcry at school, her relationship with her mother
did not go well. When R.S. insisted that she was being truthful, her mother told her to lie. She
knew that her mother had three children and believed her mother did not want to break up the family. 
R.S. did not want to alienate her mother and stated on the 2000 videotape that she dreamed the
sexual contact. Appellant returned to the home and no further incidents occurred. Over the years,
R.S. began to regard appellant as a father figure. In November 2004, R.S. became angry about
appellant beating her brother, and when asked, she acknowledged that her original accusations
were true. At this time, she felt that her mother had more confidence in her to tell the truth about
the past incidents. 

 When asked at trial why she had signed the affidavit of non-prosecution which her
mother had obtained from defense counsel, R.S. responded, "it's been two years having CPS,
the law, therapy, I just can't take it anymore." R.S. agreed, however, that her accusations were still
truthful. When asked if she had been regretting the trial, R.S. replied, "I didn't want my sister to
grow up like me without a dad."

 Suzanne Salazar, R.S.'s mother, was called by the State as a witness. She testified
that she loved her daughter and appellant, her husband, and was shocked and confused when the
allegations surfaced in April 2000. She related that R.S. made no outcry to her and would not give
her any details of what had occurred. She had inquired of R.S. if it could have been someone else
or if R.S. had dreamed something happened, but she had gotten no answers. She had not intended
to influence R.S. She acknowledged that she later told Detective McMiller that R.S. had changed
her mind. This was before the first videotape was made in which R.S. related a dream sequence. 
Mrs. Salazar reported that appellant left their home again in November 2004 when the case was re-opened. She was still legally married to appellant because of the high cost of divorce. She, however,
did not socialize with him.

 Dr. William Carter, of Waco, established his qualifications as an expert in child
sexual abuse cases. In essence, Dr. Carter testified that R.S.'s actions including recantation were
typical of children who have been victims of sexual abuse.


 Monica Garcia, appellant's sister, testified for the defense that appellant was a loving
and caring father to R.S., R.S.'s brother, and his own daughter. She described appellant coming to
her house and crying over R.S.'s allegations. Suzanne Salazar was called as defense witness without
any announcement that the defense was seeking further cross-examination. Much of her testimony
covered ground already explored. Mrs. Salazar testified that she had to believe "what she [R.S.]
says." She also believed appellant who had denied the offense. It was a "50-50" situation with her.
When asked if R.S. had previously lied to her, Mrs. Salazar responded, "we're talking about a
teenager."


FACTUAL SUFFICIENCY

 The determination of the legal and factual sufficiency of evidence requires
implementation of separate and distinct standards. Lasiter v. State, 275 S.W.3d 512, 519 (Tex. Crim.
App. 2009). "Courts and litigants should not combine their legal and factual analysis." Id. 
(emphasis added).

 A verdict [judgment] must be supported by factually sufficient evidence as well as
legally sufficient evidence. "But unlike a legal sufficiency review, which is a federal due process
requirement, a factual sufficiency review is a creature of state law. On direct appeal, a court must
begin its factual sufficiency review with the assumption that the evidence is legally sufficient under 
Jackson [v. Virginia, 443 U.S. 307 (1979)]." Id.

 Here, appellant challenges only the factual sufficiency of the evidence to sustain
his conviction, so we assume that there is legally sufficient evidence to support his conviction. 
Evidence that is legally sufficient, however, can be deemed factually insufficient in two ways: 
(1) when the evidence supporting the verdict is so weak that the verdict seems clearly wrong and
manifestly unjust, and (2) when the supporting evidence is out weighed by the great weight and
preponderance of contrary evidence so as to render the verdict clearly wrong and manifestly unjust. 
Grotti v. State, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008); Roberts v. State, 220 S.W.3d 521, 524
(Tex. Crim. App. 2007); Watson, 204 S.W.3d at 414-15. (4)

 A court of appeals on direct appeal must consider in a factual sufficiency challenge
all of the evidence in a neutral light rather than (as in a legal sufficiency review) in the light most
favorable to the verdict or judgment. Roberts, 220 S.W.3d at 524; Watson, 204 S.W.3d at 414-15. 
Although an appellate court has the ability to second-guess the jury to a limited degree, the factual-sufficiency review should still be deferential, with a high level of skepticism about the jury's verdict
required before a reversal can occur. Grotti, 273 S.W.3d at 283; Marshall v. State, 210 S.W.3d 618,
625 (Tex. Crim. App. 2006); Watson, 204 S.W.3d at 417; Cain v. State, 958 S.W.2d 407, 410
(Tex. Crim. App. 1997).

 In a factual sufficiency analysis, it must be remembered that the jury is the trier of fact
and judge of the credibility of witnesses. See Tex. Code Crim. Proc. Ann. art. 36.13 (West 2007),
art. 38.04 (West 1979); Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). Appellate
courts should be on guard not to submit their own judgment in these matters for that of the
trier of fact. See id. An appellate court is not free to override a verdict simply because it disagrees
with it. Lasiter, 275 S.W.3d at 518; Cain, 958 S.W.2d at 407.

 An appellate court must first be able to say, with some objective basis in
the record, that the great weight and preponderance of evidence contradicts the jury's verdict before
it is justified in exercising its appellate fact jurisdiction to order a new trial. Grotti, 273 S.W.3d
at 283 (citing Watson, 204 S.W.3d at 417). A reversal for factual insufficiency cannot occur
when the greater weight and preponderance of evidence actually favors the conviction. Roberts,
220 S.W.3d at 524.

 Here, appellant does not point to any sharply diverse or even conflicting evidence
that undermines the jury's verdict. Appellant called his sister and his wife, R.S.'s mother, as defense
witnesses. Their testimony did not present a defense or in effect contradict the State's case. 
Appellant's factual insufficiency claim must rest primarily upon the State's evidence being so weak
that the jury's verdict was clearly wrong and manifestly unjust. Appellant's only attack upon the
evidence being factually insufficient is to question the credibility of R.S. The jury knew that R.S.'s
first outcry was at school and not to a family member, that her recantation came after appellant left
the home and her mother talked to her, that her reassertion of the charges came over four years later
when a C.P.S. assault investigation involved appellant and her brother, and that she had signed an
affidavit of non-prosecution. Throughout the trial R.S. maintained that she was being truthful about
the sexual abuse she had endured. The jury was the judge of the credibility of the witnesses and
the weight to be given to their testimony. The jury was free to accept or reject all or any part of
a witness's testimony. It is obvious that the jury accepted R.S.'s version of events. Moreover, the
uncorroborated testimony of a child victim of a sexual assault is sufficient to sustain a conviction. 
See Tex. Code Crim. Proc. Ann. art. 38.07 (West 2005).

 Viewing all of the evidence in a neutral light, we find the jury was rationally justified
in finding appellant guilty of sexual assault. The verdict was not clearly wrong or manifestly unjust. 
See Watson, 204 S.W.3d at 417. Appellant's sole point of error is overruled.

 The judgment of conviction is affirmed.



 ___________________________________________

 John F. Onion, Jr., Justice

Before Justices Patterson, Pemberton and Onion*

Affirmed

Filed: September 10, 2009

Do Not Publish







* Before John F. Onion, Jr., Presiding Judge (retired), Texas Court of Criminal Appeals, sitting by
assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 2005).
1. Jackson v. Virginia, 443 U.S. 307 (1979).
2. Suzanne Salazar later testified that on April 1, 2000, they had a first birthday party at a park
for her daughter by appellant. R.S. in her testimony acknowledged that she once told her mother that
appellant "focused" on his own daughter and that she felt unloved.
3. This matter was explored in detail at the penalty stage of the trial.
4. The "two ways" in which evidence can be factually insufficient is frequently described
using the word "verdict," which is correct only if there has been a jury trial. "A 'verdict' is a written
declaration by a jury of its decision of the issue submitted to it in the case." Tex. Code Crim. Proc.
Ann. art. 37.01 (West 2006). In a non-jury or bench trial, the trial court's decision is referred to as
a "judgment."