# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00081-CR

**Oliver Julius Sowell, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF BELL COUNTY, 426TH JUDICIAL DISTRICT
NO. 64,287, HONORABLE FANCY H. JEZEK, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Oliver Sowell was convicted by a jury of the crime of capital murder of Kimberly Tran. *See* Tex. Penal Code Ann. § 19.03 (West Supp. 2009). After the jury made its determination, the district court imposed a life sentence. On appeal, Sowell challenges the sufficiency of the evidence supporting his conviction. We will affirm the judgment of the district court.

## BACKGROUND

In April 2008, Tran was shot outside an illegal gaming room that she and her son, Vu Min Lee, ran. Because the gaming room was illegal, Tran limited access to the room and only admitted individuals who her employees knew. In addition, Tran installed a camera outside the door to the gaming room that allowed her or her employees to see who was trying to enter the establishment.

On the day Tran died, Sowell, Bonnie Johnson (Sowell's wife), Dominique Neal, Shanay Brown, and a man named "T" were hanging out at Johnson's home. At some point in the day, they discussed the idea of robbing the gaming room. Due to the illegal nature of the gaming room, the group thought it would be a good place to rob because Tran would not involve the police. In fact, Neal stated that gaming rooms get robbed quite often but that "they can't do nothing about it because it's already illegal." Because Neal had frequently gone to the gaming room, the group thought that Tran and Lee would allow her to enter the establishment. For that reason, the group decided that Neal, Johnson, and Brown should enter the gaming room first and then later let Sowell and T into the room. In furtherance of the plan, the group decided to use the shotgun and the handgun that were inside Johnson's house during the robbery. On the way to the establishment, Sowell and T stopped to get ammunition.

Consistent with the plan discussed above, Neal, Johnson, and Brown went to the gaming room and were admitted. After gambling for a few minutes, Johnson told Lee that she had left something in her purse and asked if she could go outside to get the item from the car that she rode over in. The events that occurred after Johnson left the gaming room form the basis for this case and are disputed; however, what is not disputed is that Lee and Tran were both shot outside the gaming room by a shotgun and that Tran later died from her wounds. Further, when the police arrived on the scene, they found Johnson and Neal near the gaming room and took their statements.

After the shooting, Sowell and Johnson left Texas and went to Maryland. While in Maryland, they were involved in a car accident and were arrested when the responding police officers discovered that there were warrants out for their arrest. After their arrest, Detective Wayne

2

Martin questioned Sowell regarding the shooting. Detective Martin prepared a written statement detailing the answers that Sowell provided, and Sowell signed the statement. Eventually, Sowell was transferred back to Texas and was indicted for capital murder. *See* Tex. Penal Code Ann. § 19.03. Specifically, the indictment alleged that Sowell intentionally caused Tran's death by shooting her and that at the time of the shooting, Sowell "was then and there in the course of" robbing or attempting to rob Tran. Ultimately, a trial was held, and the jury found Sowell guilty of capital murder.

**DISCUSSION**

In his sole issue on appeal, Sowell contends that the evidence is factually insufficient to support his conviction for capital murder.

In factual-sufficiency determinations, all of the evidence is considered in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). When performing this analysis, courts bear in mind that the fact finder is the sole judge of the weight and the credibility of the evidence presented. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *see also* Tex. Code Crim. Proc. Ann. art. 36.13 (West 2007) (explaining that "jury is the exclusive judge of the facts"). Under a factual sufficiency review, the judgment may only be set aside if (1) the verdict is "against the great weight and preponderance of the evidence," or (2) the evidence is "so weak that the jury's verdict seems clearly wrong and manifestly unjust." *Watson*, 204 S.W.3d at 414-15. A conviction is not manifestly unjust simply because an appellate court would have resolved conflicts in the evidence differently, *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008), and

3

factual-sufficiency reviews are necessarily deferential to the jury's verdict, *Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008).

Under the penal code, a person commits capital murder if he "intentionally commits murder in the course of committing or attempting to commit . . . robbery." Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2009); *see also id.* § 19.02 (West 2003) (defining "murder" as "intentionally or knowingly" causing individual's death). Under the penal code, a person commits robbery if, "in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another." *Id.* § 29.02(a) (West 2003). The code further explains that a "person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West 2003). Intent to commit a crime "may be inferred" from the acts, words, and conduct of the accused and from "the circumstances under which" the criminal act occurred. *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991). In addition, intent to kill may be inferred from the use of a deadly weapon. *Henderson v. State*, 825 S.W.2d 746, 749 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd). A shotgun qualifies as a deadly weapon per se. *Dominguez v. State*, 125 S.W.3d 755, 761 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). "When a deadly weapon is fired at close range, and death results, the law presumes an intent to kill." *Sholars v. State*, 312 S.W.3d 694, 703 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

In challenging the sufficiency of the evidence, Sowell does not deny that he intended to rob Tran on the night in question; instead, he asserts that evidence is insufficient because it fails "to prove [his] intent to cause the death of . . . Tran."

4

During the trial, several of the customers that were in the gaming room at the time of the shooting testified. For example, Dorissa Martin and her daughter Virgie Blanks stated that there were inside the gaming room when Tran and Lee were shot. In addition, they both explained that prior to the shooting they heard the doorbell ring and then saw Lee answer the door. Further, they both related that after Lee initially opened the door, he struggled to close the door. Martin also explained that she saw a man trying to enter the room, that the man stuck a gun in the doorway to keep the door from closing, and that the man pointed the gun inside the building. Both Blanks and Martin related that the door eventually swung open and that Lee was pulled outside. Further, they discussed how once Lee was pulled outside, Lee and the man who tried to force his way inside the building began fighting. Also, they testified that once Tran noticed what had happened, she ran outside to help her son, and Blanks stated that Tran attempted to pull a man off of Lee but that another man shoved her out of the way. Finally, Blanks and Martin both stated that they heard gunshots and then ran out of the building through another exit.

Lee also testified regarding the night of the shooting and regarding the extensive injuries to his arm and face that he sustained that night. Regarding the events leading up to the shooting, Lee stated that Neal came to the game room with a friend and that after gambling for a while, Neal's friend asked if she could go to the car to get some money. Further, Lee related that he opened the door to let Neal's friend out and that she quickly returned to the door and rang the doorbell. Next, Lee testified that after he opened the door to let Neal's friend back into the building, he saw two men running towards the door. When describing the men, he stated that one man had a "long gun" and that the other guy had a "small gun." Lee testified that he tried to close the door

5

but that the man with the long gun pulled the door open and also pulled him outside. Next, Lee related that after he was pulled outside, he heard a "blast" and then felt "paralyzed." Lee described the event as occurring in less than a minute from when the door was pulled open. Finally, Lee identified Sowell as the person who shot him, but he admitted that he was not "one hundred percent" sure that it was Sowell.

One of Sowell's accomplices also testified during the trial.[1] In her testimony, Dominique Neal admitted that she was given immunity from prosecution for this case and that she initially lied to the police about her involvement in the crime and gave the police several different statements. When describing the meeting in which the robbery was suggested, Neal recalled that she saw a shotgun and a small handgun in Johnson's kitchen. Further, Neal testified that when the group was discussing the idea, Sowell led the conversation.

During her testimony, Neal described the plan as follows: she, Johnson, and Brown were supposed to enter the gaming room; and Sowell, T, and another man were supposed to enter the building when Johnson stepped outside to retrieve something from the car. Although Neal initially insisted that she had no knowledge that anyone would be using a gun, she later testified that the plan was for Sowell to carry a gun. Further, Neal related that the plan was just to "get in there and just scare them, that's it." Also, Neal stated that after Sowell and T entered the building, she was supposed to lay on the floor and pretend to be a victim.

---

[1] The jury charge properly instructed the jury that they could not convict Sowell based solely on the testimony of an accomplice unless the accomplice's testimony was corroborated by other evidence tending to connect the defendant with the offense. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005) (prohibiting convictions based on testimony of accomplice unless testimony is corroborated).

Regarding the shooting, Neal stated that after the plan was discussed, Sowell, T, and another man went to a pawnshop to purchase ammunition. Next, Neal explained that after she, Johnson, and Brown went inside the establishment, Johnson asked Lee if she could go to the car to retrieve her phone. Finally, Neal stated that she saw Johnson push Lee over, that she saw Tran run outside, and that she heard three gun shots.

In addition to testimony describing events leading up to the shooting, several witnesses also provided testimony regarding events occurring after the shooting. For example, April Swingrum, who was Sowell's neighbor at the time of the shooting, testified regarding an encounter that she had with Sowell shortly after the shooting.[2] In her testimony, Swingrum stated that on the night of the shooting, Sowell knocked on her backdoor. Further, she explained that when she opened the door, she saw that Sowell had blood on his hands and feet. When describing her interaction with Sowell, Swingrum stated that she asked Sowell what happened and that he said that he tried to go into a gaming room but that "it went bad." Moreover, Swingrum testified that when she asked Sowell follow up questions, he stated that a man and a woman came out of the gaming room and started fighting with him and that he had to "get them off of him in some kind of way" so he "hit the guy and" shot him and "shot the lady."

Detective Martin also testified regarding events occurring subsequent to the shooting. In particular, he stated that he questioned Sowell about the shooting shortly after Sowell was arrested in Maryland. Further, Detective Martin explained that he wrote down Sowell's description of the

---

[2] In her testimony, Swingrum acknowledged that she did not initially tell the police what Sowell told her about the shooting, but she also stated that she was afraid of what Sowell might do if she told the police.

shooting, read it back to Sowell, and had Sowell sign the statement.[3]  In the statement, Sowell mentioned that he initially did not want to rob the gaming room but ultimately agreed to go along with the plan.  Moreover, the statement revealed that during the robbery attempt, Sowell was holding a shotgun and that another individual was holding a handgun.  In addition, the statement described Sowell's recollection of the events leading up to the shooting as follows: Lee came out of the building "and immediately attacked me.  We fought then the shotgun went off.  I pushed him off of me and shot him."[4]  In addition, the statement contained Sowell's assertion that although he intended to enter the gaming room to get some money, he never intended to hurt anyone.

When looking at all of the circumstances surrounding the offense and when viewing all of the evidence in a neutral light, including the fact that Sowell displayed and used a shotgun during the robbery attempt, we conclude that a rational trier of fact could have concluded that Sowell

---

[3]  After waiving his rights, Sowell agreed to allow Detective Martin to prepare the statement, but Sowell also checked a box stating that he was under the influence of drugs at the time that the statement was made.  In his testimony, Detective Martin stated that he asked Sowell what drugs Sowell had consumed and that Sowell replied that he had "smoked marijuana" earlier.  Detective Martin also explained that Sowell understood where he was and appeared lucid.  On appeal, Sowell does not challenge the admission of his statement into evidence.

[4]  In light of this statement, Sowell contends that two shots were fired, that the first shot was fired when he was fighting with Lee and when the gun just "went off," and that the first shot must have been the shot that killed Tran.  For this reason, Sowell contends that the only shot that was intentionally fired was the one that hit Lee and that, therefore, the State failed to show that he intended to kill Tran.  Similarly, Sowell also asserts that because the indictment failed to provide an instruction regarding transferred intent, the evidence can only be sufficient if it establishes his intent to kill Tran, not Lee.  *See Sholars v. State*, 312 S.W.3d 694, 697-98 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (relating that jury charge stated that jury could find defendant guilty of capital murder if it determined that defendant intended to kill decedent during course of committing robbery or if it determined that defendant intended to kill someone other than decedent during course of robbery but killed decedent instead).  However, when all of the evidence is considered and when considering the jury's role in making credibility determinations, we believe that there was sufficient evidence to show that Sowell intentionally killed Tran.

intended to kill Tran in the course of committing or attempting to commit robbery. *See* Tex. Penal Code Ann. § 19.03(a)(2). Accordingly, we cannot conclude that the evidence supporting the judgment is so weak as to make the jury's verdict clearly wrong or unjust, nor can we conclude that the verdict is against the great weight and preponderance of the evidence. Therefore, the evidence is factually sufficient, and we overrule Sowell's issue on appeal.

## CONCLUSION

Having overruled Sowell's issue on appeal, we affirm the judgment of the district court.

_____

David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed: August 31, 2010

Do Not Publish