

## NUMBER 13-09-00037-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

**ELIJAH NEIGHBORS,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

### On appeal from the 377th District Court
### of Victoria County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Vela
Memorandum Opinion by Chief Justice Valdez**

A jury found appellant, Elijah Neighbors, guilty of aggravated sexual assault of a child, a first-degree felony. *See* TEX. PENAL CODE ANN. §22.021(a)(1)(B)(i), (a)(2)(B) (Vernon Supp. 2009). The trial court concluded that Neighbors had previously been convicted of sexual assault and imposed a mandatory life sentence. *See id.* § 12.42(c)(2)(A)(i), (c)(2)(B)(ii) (Vernon Supp. 2009). By two issues, Neighbors contends that: (1) the trial court erred in excluding expert testimony; and (2) the evidence is factually

insufficient to support his conviction. We affirm.

## I. BACKGROUND

### A. A.L.'s Testimony

A.L. testified that on March 31, 2007, she visited her fifteen-year-old boyfriend, C.D.[1] Sometime that afternoon, A.L. saw Neighbors, the stepfather of A.L.'s friend, G.C., and asked him if she could go to his house. Neighbors agreed and drove twelve-year old A.L. to Neighbors's home. A.L. sat in the living room and visited with G.C. and her three younger siblings until G.C. received a phone call and went to the movies. A.L. testified that after G.C. left, she and Neighbors "started talking and he told me that I looked sexy eating popsicles" and "sexy the way I walk." A.L. stated that Neighbors started drinking and told her that he "wishe[d] he was 12 again and he could show me what real love is like." A.L. testified that Neighbors then asked if he could have sex with her and told her that they could "go to the room." A.L. testified that she was scared and "surrendered and followed" Neighbors to a back bedroom.

A.L. testified that once inside the bedroom, Neighbors instructed her to "take [her] clothes off and bend over." A.L. took off her pants and panties, and Neighbors removed his pants and underwear. A.L. bent over and Neighbors inserted his erect penis into her vagina. Neighbors then "started moving" in and out of her. A.L. stated that she tried to pull away from him but he "jerk[ed]" and "pull[ed]" her back with such force that her stomach and sides later hurt. A.L. testified that the encounter lasted for five to ten minutes and ended when Neighbors ejaculated "inside" of her. Neighbors warned A.L. not to tell anyone and offered to pay her and introduce her to a friend that was her age. Neighbors

---

[1] Although the complainant's identity was not concealed at trial, given the nature of the case, on appeal we will use only her initials, the initials of her mother and mother's boyfriend, and the initials of other juveniles involved.

2

then drove A.L. to her friend P.C.'s house.

A.L. testified that she did not tell anyone at P.C.'s house about what had happened because she "didn't feel comfortable telling them something like that." A.L. spent the night at P.C.'s house, and her mother's boyfriend, J.P., picked her up and drove her to home the next day. On the ride home, A.L. told J.P. what happened, and once home, J.P. told her mother, M.L. M.L. "went straight to the phone" and then told A.L. to change her panties. M.L. placed the panties that A.L had been wearing into a plastic bag and took A.L. to the hospital.

At the time of trial, A.L. was fourteen years old and visibly pregnant. A.L. testified that her encounter with Neighbors was neither her first nor her most recent sexual experience. A.L. explained that her grandfather was currently in prison for exposing himself to her and her sisters four years earlier. A.L. denied having sex with her boyfriend, C.D.; however, she later admitted that she had engaged in sexual intercourse with C.D. on the same day as her alleged encounter with Neighbors. A.L. also testified that, at the time of trial, she was pregnant with the child of another boyfriend.

On cross-examination, A.L. stated that although she visited the hospital on March 31, there was no nurse on duty to examine her so she went home and bathed before returning for an examination three days later. A.L. admitted that she did not always tell her mother where she spent the night and that she had stayed places without her mother's permission. A.L. also gave conflicting testimony regarding the date that she arrived at C.D.'s house. However, on re-cross examination, A.L. admitted that her mother dropped her off at C.D.'s house on March 30, and that she spent the night and had unprotected sex with C.D. twice during her visit—once on the night of March 30 and once on the morning of March 31.

3

**B.      J.P.'s and M.L.'s Testimony**

J.P. testified that he picked up A.L. from P.C.'s house on April 1.  On the drive home, J.P. noticed that A.L. appeared "kind of nervous, fidgety" and then told him what had happened at Neighbors's house the day before.  On cross-examination, J.P. testified that he had not observed any bruising or injuries on A.L.  J.P. also acknowledged that A.L was not always truthful about where she stayed at night and that A.L. no longer lived with him and M.L because she "would act out" when she "didn't get to do what she wanted to do."

The jury then heard testimony from M.L.  M.L. testified that A.L. complained that her stomach and sides hurt when she returned home from P.C.'s house.  A.L. then told M.L that Neighbors "made her" have sex with him and that "they [A.L. and Neighbors] were sitting on the couch and he told her that he wanted to show her what real love is and how much that she turned him on."  A.L. told M.L. that later, in another room, Neighbors told her to pull her pants down and then "[h]e bent her over and he did it from behind in her vagina."

After A.L. described the encounter, M.L. called the police and was instructed to take A.L., as well as the panties that A.L. had worn at the time of the encounter, to the hospital.  M.L. stated that at the emergency room she turned over A.L.'s panties to the police.  M.L. testified that the hospital staff checked A.L.'s vital signs and scheduled a Sexual Assault Nurse Examiner ("SANE") examination that was performed the following day.

On cross-examination, M.L. testified that she was not aware that A.L. and C.D. were sexually active when she dropped A.L. off at C.D.'s house on March 30.  She also testified that A.L. never lied about where she was going to stay and was always truthful about her sexual activity.  However, M.L. admitted that A.L. did not tell her that she had engaged in sexual intercourse with C.D. on the same day as her alleged sexual encounter with

4

Neighbors.

## C. Esther Vasquez's Testimony

The SANE examination was conducted by nurse Esther Vasquez on April 2. Vasquez testified that A.L. had no complaints of pain. However, upon examination, Vasquez detected "clefts and notches at the seven o'clock and three o'clock positions of the hymen" and "three tears that were half a millimeter in length on the posterior fourchette, which is the area between the rectum and the vagina." Vasquez testified that these injuries were consistent with both the type of action and sexual position that A.L. alleged that Neighbors had employed.

On cross-examination, Vasquez testified that when she asked A.L. when she had engaged in her most recent sexual contact with a male prior to the alleged assault, A.L. responded, "Three weeks." Vasquez also testified that A.L.'s injuries indicated that "sexual intercourse had taken place," and that nothing on A.L.'s body surface, like bruises, cuts or abrasions, indicated that A.L. had been assaulted.

## D. Thurmond Marshall's Testimony

Investigator Thurmond Marshall of the Victoria County Sheriff's Department testified that he spoke to Neighbors shortly after April 1, and informed him of A.L.'s allegations. Neighbors told Investigator Marshall that A.L. had come to his house on the day in question, but was picked up from his home by "a bunch of Hispanic boys" shortly after G.C. went to the movies. However, at a later interview, Neighbors told Investigator Marshall that he did not know when A.L. left his home. On April 5, Investigator Marshall spoke with Neighbors and asked him about these inconsistent statements. At that point, Neighbors told Investigator Marshall that after G.C. went to the movies, he gave A.L. a ride to Victoria.

Neighbors also told the investigator that G.C. had told him to stay away from A.L., and that A.L. had snuck out of his house when she had spent the night with G.C. in the past. Neighbors also stated that his DNA would not be found on A.L. or her clothing, but he refused to submit to DNA testing.

**E.    Forensic Evidence**

Cynthia Morales, a forensic scientist with the Department of Public Safety Crime Lab in Corpus Christi ("DPS lab"), testified that she ran an analysis of DNA collected from a semen stain found on the panties worn by A.L. on March 31. The semen stain was treated as a "mixture sample" because it contained the DNA of more than one individual. Morales stated that it was common to have a mixture in a sexual assault case. In order to collect DNA from the semen stain, Morales isolated epithelial cell DNA, "which is usually attributable to the victim," from the sperm cell DNA, which is attributable to males. Morales then analyzed alleles at fifteen locations in the DNA and compiled a DNA profile based on her findings.[2] Morales entered the DNA profile into a computer database to determine if anyone in the database contributed to the sample gathered from A.L.'s panties.

Lisa Harmon Baylor, also a forensic scientist with the DPS lab, testified that the computer identified Neighbors as a match. Baylor contacted the Victoria County Sheriff's Department and obtained an additional DNA sample from Neighbors, which she compared to the profile obtained from A.L.'s panties. Baylor testified that Neighbors could not be excluded as a contributor of the sperm cell fraction and that the probability of randomly selecting an unrelated person as the source of the profile was 1 in 2.848 billion for African

---

[2] An allele is defined as "[a]ny one of two or more genes that occupy the same location on homologous chromosomes and determine the heredity of a particular trait." IDA G. DOX ET AL., ATTORNEY'S ILLUSTRATED MEDICAL DICTIONARY A24 (1997).

6

Americans. Baylor stated that there was no strong indication that an additional male contributed to the sample of DNA gathered from A.L.'s panties. However, Baylor later testified that even if there had been a third contributor, the probability that Neighbors was a contributor would remain unchanged. On-cross examination, Baylor stated that, based on the probability previously provided, she was able to conclude that Neighbors could not be excluded as a possible contributor to the sample of DNA gathered from A.L.'s panties; however, because the semen stain was a "mixture sample," the probability was not high enough to say "within a reasonable degree of scientific certainty" that Neighbors was the source.

Dr. Richard Gunasekera, the defense's expert witness, testified that DNA results usually do not indicate that a person "definitely" committed a crime because the DNA of every human being is "99.9 percent the same." He also explained that a deposit of semen does not necessarily prove that an aggravated sexual assault occurred. Dr. Gunasekera stated that a "mixture sample" that is not separated correctly can affect the reliability of the results obtained. Dr. Gunasekera then explained that when multiple contributors have similar alleles, it is difficult to "see the difference" and establish DNA profiles. Moreover, Dr. Gunasekera testified that the presence of a third, unknown contributor could lower the reliability of the results obtained from the sample. On cross-examination, Dr. Gunasekera stated that he had not conducted a test of the biological sample obtained from A.L.'s panties.

## II. FACTUAL SUFFICIENCY

### A. Standard of Review and Applicable Law

When conducting a factual sufficiency review, we view all of the evidence in a

neutral light. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We will set aside the verdict only if (1) the evidence supporting the conviction is too weak to support the verdict, or (2) when the evidence supporting the verdict is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust. *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009) (citing *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)); *Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008).

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). A person commits aggravated sexual assault of a child when he intentionally or knowingly causes the penetration of the sexual organ or anus of the child by any means. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(2)(B). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result; a person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(a), (b) (Vernon 2003).

## B. Analysis

In his second issue, Neighbors contends that the evidence was factually insufficient given "the weakness of the State's overall case and lack of physical evidence in this matter" and A.L.'s "lack of credibility." We disagree.

The jury heard testimony that DNA analyses of a stain found on A.L.'s panties revealed that Neighbors could not be excluded as a contributor to the stain and that,

8

although the analysis did not confirm to a reasonable degree of scientific certainty that Neighbors was the source of the DNA, the probability of randomly selecting an unrelated person as the source of the profile was 1 in 2.848 billion for African Americans. Baylor testified that DNA analysis revealed an "extra allele" that did not belong to A.L. or Neighbors. Baylor explained that the "extra allele" potentially indicted the presence of a third contributor; however, she stated that there was no strong indication that an additional male contributed to the sample of DNA gathered from A.L.'s panties. Baylor also testified that even if there had been a third contributor, the probability that Neighbors was a contributor would remain unchanged. On the other hand, defense expert, Dr. Gunasekera, testified that the possibility of a third contributor would lower the reliability of the result reached by the DPS lab.

Even disregarding the physical evidence presented, the evidence was factually sufficient to support the jury's verdict. The testimony of a child victim is alone sufficient to support a conviction for aggravated sexual assault. TEX. CODE CRIM. PROC. ANN. art. 38.07 (Vernon 2005); *see Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978). A.L. testified that when she was twelve years old, Neighbors made sexually-related comments to her, including asking her if she would have sex with him, which scared her into compliance. A.L. testified about the details of a sexual encounter that involved Neighbors inserting his erect penis into her vagina and ejaculating inside her. Moreover, A.L.'s testimony was corroborated by the testimony of M.L.

Despite Neighbors's argument regarding the weakness of the State's case and lack of physical evidence, Neighbors focuses his factual sufficiency argument on A.L.'s credibility. Specifically, Neighbors argues that A.L. "was untruthful with her parents about

where she was going and her sexual activity because she wanted to avoid getting in trouble; she was untruthful with the State at trial arguably to keep her boyfriend, [C.D.], out of trouble, and she was untruthful with the SANE examiner for some untold reason." During direct examination, A.L. testified that at the time of the alleged sexual assault by Neighbors, she had not engaged in any sexual related activity with C.D. After the State reminded A.L. that her testimony was inconsistent with a prior statement that she had given, A.L. admitted that she had engaged in sexual intercourse with C.D. prior to, but on the same day as, the alleged sexual assault. The jury also heard testimony that A.L. did not tell the SANE nurse that she had engaged in sexual activity with C.D. on the day in question. Moreover, A.L. admitted that she had stayed places without her mother's permission and had not always been truthful about where she spent the night.

Although the evidence calls A.L.'s credibility into question, it is the jury's sole responsibility to judge the credibility of witnesses, and the jury is free to believe or to disbelieve any portion of a witness's testimony. *Cain v. State*, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997); *Ortega v. State*, 207 S.W.3d 911, 920 (Tex. App.–Corpus Christi 2006, no pet.); *see also Ortiz v. State*, No. 13-05-696-CR, 2006 WL 1644600, at *2 (Tex. App.–Corpus Christi June 15, 2006, no pet.) (deferring to the jury's role as fact finder where the jury was "presented with testimony that could have called the victim's credibility into question").

Viewing the entire record in a neutral light, we cannot say that the jury's verdict is too weak to support the fact finder's verdict, manifestly unjust, or against the great weight and preponderance of the evidence. *See Laster*, 275 S.W.3d at 518. Accordingly, we conclude that the evidence supporting Neighbors's conviction is factually sufficient. *See*

*Grotti*, 273 S.W.3d at 283.  We overrule Neighbors's second issue.

### III. EXPERT TESTIMONY

In his first issue, Neighbors contends that the trial court abused its discretion in "limiting and/or excluding" Dr. Gunasekera's testimony because it "erroneously applied Texas Code of Criminal Procedure [article] 38.35 to exclude Dr. Gunasekera's testimony regarding his findings, opinions and conclusions after reviewing the DPS lab's 'DNA match.'"

### A.     Standard of Review and Applicable Law

We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion.  *Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006).  A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).

Texas Code of Criminal Procedure article 38.35(d) provides that a forensic analysis of physical evidence and expert testimony relating to the evidence are not admissible in a criminal action if, at the time of the analysis, the crime laboratory conducting the analysis was not accredited by the Texas Department of Public Safety.  TEX. CODE CRIM. PROC. ANN. art. 38.35(d)(1) (Vernon Supp. 2009).

### B.     Analysis

On appeal, Neighbors argues that the trial court erred in excluding portions of Dr. Gunasekera's testimony because the court based its ruling on the State's "sole objection" that Dr. Gunasekera "was not part of an accredited laboratory."  *See* TEX. CODE CRIM. PROC. ANN. art. 38.35; *see also* TEX. GOV'T CODE ANN. § 411.0205 (Vernon Supp. 2009).

11

The State argues that only its "initial challenge was to the expert's qualifications under rule 703 by applying the accreditation requirements of section 411.0205 of the Texas Government Code and article 38.35(d) of the Texas Code of Criminal Procedure" and that it "continued to object during the hearing, challenging the reliability of the expert's opinion" as well as "the testimony's admissibility on relevancy and other grounds under rules 401 and 403." According to the State, Dr. Gunasekera was precluded from challenging "the DPS lab's DNA analyses because he did not perform an independent analysis, not because he was not accredited."

Our review of the record demonstrates that the trial court continuously referred to, and based its ruling upon, article 38.85.[3] *See* TEX. CODE CRIM. PROC. ANN. art. 38.35. Although the plain language of article 38.85 makes it clear that forensic analyses must be performed by an accredited laboratory, no Texas case has addressed whether the statute applies to an expert who reviews an accredited lab's forensic analysis and forms an opinion regarding the analysis' interpretation without performing an independent forensic analysis.

Assuming, without deciding, that the trial court erred in excluding portions of Dr.

---

[3] Shortly after the defense counsel concluded its offer of proof, the court stated:

Okay. And what this statute says is that for you to offer evidence, it has to be from an accredited lab and not speculation by someone who is not an accredited lab about results of an accredited lab in determining the DNA samples. And so I will not allow speculation by a non-accredited lab. And I'm not saying Dr. Gunasekera can't do this, I'm saying he doesn't have the credentials that the State requires me, as the gatekeeper of the evidence, to find to allow you to do the things you're wanting to do. You need a different—you either needed a different expert or you need to have him get samples and test it on his own . . . .

. . . .

Okay. But you see what I'm saying? I have a duty, as the gatekeeper, to uphold these statutes that have been given to me, so in keeping with the statute I'm not going to allow anyone, Dr. Gunasekera or anyone else, no matter how qualified they are no matter how much smarter than you they are about DNA, to come in and say well, the Corpus Christi Lab blew it . . . .

12

Gunasekera's testimony, such error was harmless. *See* TEX. R. APP. P. 44.2(b) (providing that any error, other than constitutional error, that does not affect substantial rights must be disregarded). A substantial right is affected when, after reviewing the record as a whole, a court concludes that the error has a substantial and injurious effect or influence on the outcome of the proceeding. *See Burnett v. State*, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In conducting a harm analysis, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the trial court's instructions to the jury, the State's theory, any defensive theories, closing arguments, and even voir dire if material to Neighbors's claim. *See Motilla v. State*, 78 S.W.3d 352, 355-56 (Tex. Crim. App. 2002). In assessing harm, factors to be considered include the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with the other evidence in the case. *Id.* The weight of the evidence of Neighbors's guilt is also relevant in conducting the harm analysis under Rule 44.2(b). *Id.* at 357; *see* TEX. R. APP. P. 44.2(b).

In determining the magnitude of the harm resulting from the exclusion of portions of Dr. Gunasekera's testimony, we have examined and considered the entire record. During trial, the trial court conducted a hearing of Dr. Gusanekera outside the jury's presence. At the hearing, defense counsel presented Dr. Gunasekera's testimony through a question-and-answer offer of proof. At the hearing, the trial court expressed the following concern:

> What [Dr. Gunasekera is] going to say is well, there could have been—she [A.L.] could have had sex with two guys or three guys because there's evidence that there might be another male present. But I don't hear anybody saying anything to me that, well, missing that DNA is going to make

it impossible for any accredited lab to read accurately anybody's DNA, because they have read a DNA chain and they have drawn a known sample of blood from Mr. Neighbors and read that DNA chain and it matches on 15 points. . . .

Outside of the jury's presence, Dr. Gunasekera testified that he had not performed an independent forensic analysis of A.L.'s panties and, instead, formed his opinions after reviewing a hard copy of the DPS lab's forensic analysis. Dr. Gunasekera stated that his review revealed "other alleles in the mixed sample that do[ ] not belong . . . to either [A.L.] or [Neighbors]." According to Dr. Gunasekera, the presence of these "other alleles" generated the possibility of confusion of matching the alleles to Neighbors and possibly indicated that there was more than one suspect. Dr. Gunasekra's testimony continued:

> [Defense Counsel]: Okay. Do you have an alternative theory that you formed from reviewing this same—the same information?
>
> [Dr. Gunasekera]: The only theory I can say is that there's more than two individuals in this one sample that's been studied for the evidence.
>
> Q: Would that be consistent with another sexual encounter in this same time period?
>
> A: It could be.
>
> Q: Does that . . . [w]hen we're looking at the mixtures that you have reviewed, is there a possibility that because we don't know the unknown person and their [sic] DNA, that some of that DNA may be masquerading as Mr. Neighbors'[s]? Is that possible?
>
> A: That's possible, yes, sir.
>
> Q: In the alternative, is it also possible, according to your review of the information, that either that is—either that is correct or, alternatively, the sample is not representative enough to be able to make a definitive finding?

14

A:                     That could be possible, too.

After defense counsel conducted its question-and-answer offer of proof, the trial court stated:

> What he [Dr. Gunasekera] has said is exactly the scenario that I laid out for you, is that all he can say to the jury is that there may have been more than one sexual encounter by [A.L.] on the day in question. I think she's already admitted that in front of the jury. He can't exclude your client as one of those participants. And so if the jury believes, based on the DNA testing done by the lab in Corpus Christi, that he is a participant, either one of many or the only one, it doesn't make any difference, because the statute doesn't say he's absolved if he's the third guy or the fifth guy. It says that he cannot have consensual sex with a 12-year-old child and that's what we're here about. It's not about whether he is one of many, it's about whether he's one at all.

The trial court then ruled that Dr. Gunasekera would be allowed to testify and explained:

> But [Dr. Gunasekera] won't be allowed to do anything that re-interprets or says other than what that . . . [.] He can educate—if you think it's beneficial to have him educate the jury on what alleles and loci or locus or whatever it is, if you think that's beneficial to you, you can do that. But he cannot say that he believes that [Neighbors] is not a contributor to that DNA mixture in the panties of [A.L.]

On appeal, Neighbors argues that he was "denied the opportunity to present to the jury [Dr. Gunasekera's] opinions and conclusions which called the State's 'DNA match' into doubt." Upon limiting Dr. Gunasekera's testimony, the trial court ruled that Dr. Gunasekera could testify that, in general, a mixed sample of more than two persons reduces the reliability of DNA testing. At trial, the jury heard testimony that, on the day in question, A.L. had unprotected sex with C.D. prior to the alleged sexual assault by Neighbors. Morales testified that the DNA sample from the semen stain was treated as a "mixture sample" because it contained the DNA of more than one individual. Baylor testified that there was no strong indication that an additional male contributed to the "mixture sample." However,

15

Dr. Gunasekera testified before the jury that: (1) a mixture sample of more than two persons "very much" reduces the reliability of the results of a forensic analysis; (2) a "mixture sample" that is not separated correctly can affect the reliability of the results obtained; (3) when multiple contributors have similar alleles, it is difficult to "see the difference" and establish DNA profiles; and (4) the presence of a third, unknown contributor could lower the reliability of the results obtained from the sample.

During closing arguments, defense counsel reminded the jury that "this case is about[ ] three things. It's about flawed testimony, it's about flawed histories, it's about flawed results." Defense counsel emphasized the possibility of a third contributor, as well as the possibility that the presence of a third contributor undermined the reliability of the DPS lab's results.[4]

---

[4] During closing arguments, defense counsel argued:

Now, we know from what we've heard, if you choose to believe the fact that she had sex, as she said, with [C.D.] those two days and that she hadn't bathed or she was wearing the same clothing, the same panties, now those panties are where all of our DNA testing comes from. She told you that she had used no condom with [C.D.], who is also African American, so I think you can reasonably deduce whether you think that there was a third contributor to that stain that was being tested.

Now, we also know this. When it comes to DNA evidence, DNA evidence never says this is the person, it says I can't exclude this person. But if you recall my questioning to Lisa Harmon Baylor, I asked her if this was like a card game when we're looking at different people's DNA. She said yeah, it's like a card game, but we have cards that have the same numbers. We all sit at the card table and we get our hands in front of us. And the two people at the table who we know write down what cards they have. There's someone else sitting there and we don't know what cards they have, let's throw them all in the middle. Well, one person had a two and the other person had a two, whose is it? Couldn't tell you that, but I know they both have two's. But when you don't know what the other card holder had and you've mixed it all up in this pile, that's how we have the problem of, well, is it really Mr. Neighbors or is the unknown person. Does it really belong to the victim or does it belong to Mr. Neighbors, or how about the unknown person that we don't have? Who knows. And the problem with that for the State is that that affects the reliability of the test.

Now, if you recall Ms. Baylor's testimony, you remember I asked her, well, we ought to be able to account for all of the alleles, right, because you have a perfect match, so we should be able to put these all in order and figure out who's who. But you'll also recall she had no answer for me. I said what about this allele, where does that go? Well, I don't know. That was her response, basically. And when she says yeah, she admitted there could be another contributor. Well, in the end no DNA expert knows what goes into a sample . . . . But

16

Moreover, as previously discussed, A.L.'s testimony is alone sufficient to support a conviction for aggravated sexual assault. TEX. CODE CRIM. PROC. ANN. art. 38.07; *see Garcia*, 563 S.W.2d at 928. Therefore, even if the jury chose to discredit the DPS lab's results, the jury, nevertheless, could have found beyond a reasonable doubt that Neighbors committed aggravated sexual assault. *See id.*

Upon reviewing the entire record, we conclude that the trial court's error, if any, did not have a substantial and injurious effect or influence on the jury's verdict and must be disregarded. *See* TEX. R. APP. P. 44.2(b). Accordingly, Neighbors's first issue is overruled.

## IV. CONCLUSION

Having overruled all of Neighbors's issues on appeal, we affirm the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
1st day of April, 2010.

---

when you start off with something that's unknown and then you start off with something that you may not be able to trust, then you cannot trust the reliability of those results.