

**NUMBER 13-08-00592-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**FELIX TOVAR, III,**                                                                                   **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                              **Appellee.**

---

**On appeal from the 156th District Court
of Bee County, Texas.**

---

# MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Benavides
### Memorandum Opinion by Justice Rodriguez

A jury convicted appellant, Felix Tovar, III, of one count of aggravated sexual assault

of a child, three counts of indecency with a child by contact, and three counts of indecency

with a child by exposure.  *See* TEX. PENAL CODE ANN. §§ 22.021(a)(1)(B), 21.11(a)(1),

(a)(2)(A) (Vernon Supp. 2009).  Each conviction was subject to an enhancement for a prior

felony committed by appellant. *See id.* § 12.42(b), (c)(1) (Vernon Supp. 2009). Tovar was sentenced to forty years' incarceration for aggravated sexual assault of a child, twenty years' incarceration for each count of indecency with a child by contact, and fifteen years' incarceration for each count of indecency with a child by exposure. Punishment for each count was ordered to run concurrently at the Institutional Division of the Texas Department of Criminal Justice (ID-TDCJ). Appellant presents one issue challenging the factual sufficiency of the evidence in support of his convictions. We modify the judgment and affirm as modified.

## I. BACKGROUND

Appellant is the uncle of the three alleged female victims: R.M.T., S.B.T., and S.J.T.[1] He was staying for a short period at the home of his brother, J.T., the father of the three alleged victims, when the alleged offenses occurred.

On March 27, 2008, while in the lobby of a doctor's office, S.B.T. approached her mother, C.T., and made the initial outcry. S.B.T. was nine at the time. Over the next two days, S.J.T. and R.M.T. also outcried to C.T. Shortly thereafter, C.T. contacted Daniel Lee Caddell, a member of her church and the captain of the criminal investigation division of the Bee County Police Department. Captain Caddell took C.T.'s outcry witness statement. The three girls were subsequently interviewed at Children's Advocacy Center in Corpus Christi, Texas. On May 7, 2008, R.M.T. made an additional outcry in a pre-indictment interview with the district attorney and the crime victims coordinator, Christina Segovia.

---

[1]To protect the identity of the children, in our opinion, we use aliases, i.e. initials, to refer to the minors and to the minors' parents.

After R.M.T.'s additional outrcry, the three victims were physically examined by a Sexual Assault Nurse Examiner (SANE nurse) at Driscoll Hospital.

The trial commenced on October 1, 2008, and appellant pleaded not guilty to all counts. The State proceeded on all eight counts from the indictment.[2]

The State called ten witnesses to testify as to the allegations. The witnesses included Captain Caddell; the three alleged victims; Segovia; the victims' mother, C.T.; the victims' father, J.T.; a fellow inmate of appellant's, Daryl Howell, II; the lead forensic interviewer at Children's Advocacy Center, Ricardo Jimenez; and SANE nurse Sonja Eddleman.

## A. Captain Caddell's Testimony

Captain Caddell testified regarding his involvement with this case and his experience with sexual abuse cases. He stated that C.T. came to his office and reported to him that her three daughters told her that their uncle, appellant, had inappropriate sexual

[2]Count 1 alleged that on or about February 27, 2008, appellant intentionally or knowingly penetrated the sexual organ of R.M.T., a child younger than six years of age and not the spouse of the appellant, by the appellant's mouth. Count 2 alleged that on or about February 27, 2008, appellant intentionally or knowingly penetrated the sexual organ of R.M.T., a child younger than six years of age and not the spouse of the appellant, by the appellant's sexual organ. Count 3 alleged that appellant, on or about February 16, 2008, with the intent to arouse or gratify the sexual desire of said defendant, intentionally or knowingly engaged in sexual contact with S.B.T., a child younger than seventeen years of age and not the spouse of the appellant, by touching the anus of S.B.T. Count 4 alleged that appellant, on or about February 16, 2008, with the intent to arouse or gratify the sexual desire of said appellant, intentionally or knowingly engaged in sexual contact with S.J.T., a child younger than seventeen years of age and not the spouse of the appellant, by touching the anus of S.J.T. Count 5 alleged that appellant, on or about February 16, 2008, with the intent to arouse or gratify the sexual desire of said appellant, intentionally or knowingly engaged in sexual contact with R.M.T., a child younger than seventeen years of age and not the spouse of the appellant, by touching the anus of R.M.T. Count 6 alleged that appellant, on or about February 16, 2008, with the intent to arouse or gratify the sexual desire of said appellant, intentionally or knowingly exposed the appellant's genitals knowing that S.B.T., a child younger than seventeen years of age and not the spouse of the defendant, was present. Count 7 alleged that appellant, on or about February 16, 2008, with the intent to arouse or gratify the sexual desire of said appellant, intentionally or knowingly exposed the defendant's genitals knowing that S.J.T., a child younger than seventeen years of age and not the spouse of the appellant, was present. Count 8 alleged that appellant, on or about February 16, 2008, with the intent to arouse or gratify the sexual desire of said appellant, intentionally or knowingly exposed the appellant's genitals knowing that R.M.T., a child younger than seventeen years of age and not the spouse of the appellant, was present.

3

contact with them. He took an outcry witness statement from C.T. and scheduled an interview for the three girls at the Children's Advocacy Center.

On March 31, 2008, Captain Caddell "observed [the] witnesses being interviewed by" Ricardo Jimenez at the Children's Advocacy Center "via closed-circuit TV." In the interview, the three girls revealed that their two brothers were in the room while the alleged activities occurred. Following the interviews, he tried "to corroborate their statements." He testified that he went to the home of C.T. where the alleged abuse occurred and interviewed the two brothers; they had not seen or heard anything. Captain Caddell confirmed that he did not find any corroborating evidence.

Captain Caddell testified that in his thirty-five years of experience, in some cases, the word of a child without any physical evidence and no corroboration had been enough to convict a defendant. He further attested that a Sexual Assault Nurses Examination (SANE examination) is not always done if the child does not indicate "more than just exposure or touching under the clothes." If they indicate more, "then at that point . . . they will do a [SANE examination]." A SANE examination was not done here "because the first interview did not indicate any type of sexual assault by contact."

Captain Caddell testified that children will outcry more as they get comfortable.

> The younger the child is[,] it isn't uncommon for them to make numerous additional outcries. As they start going through the process they get more comfortable in talking about what happened, and they will remember things. Normally it's disjointed and a lot of times not in sequence, but it's depending on their age and maturity.

Captain Caddell testified that on May 7, 2008, "additional outcries were made." Upon the second outcry, Captain Caddell scheduled a SANE examination. On May 13, 2008, all three girls went to Driscoll Hospital for the examination. Captain Caddell received

4

the medical reports and noted that there was no physical evidence collected and that there was no DNA evidence to be found.

Additionally, Captain Caddell testified that he was present, along with the district attorney, during a videotaped interview of Howell. Captain Caddell and the district attorney "interviewed him and he told [them] what the Defendant had been saying about the case." Captain Caddell testified that at no time during the interview were any promises made regarding Howell's pending felony case.

## B. R.M.T.'s Testimony

R.M.T. testified that she is currently five years old and was present to talk about "Uncle Felix." R.M.T. identified the mouth and genitals of an anatomically correct female doll and named the part "where you tee-tee" as a "bump" and referred to the backside of the doll as a "butt." R.M.T. also identified the parts of an anatomically correct male doll and named the penis as "a pee-pee." In reference to appellant, R.M.T. said, "he wasn't nice . . . he put his pee-pee . . . in the middle" and that it "hurt." She testified that it happened more than once and she saw his "pee-pee." She also testified that she did not feel his "pee-pee" and he did not do anything with his mouth. R.M.T. further testified that "Uncle Felix" touches her "bump" with his "hands."

Over the course of her testimony, R.M.T. reported that "nobody else" but her "Mom and Dad" were there when the alleged abuse occurred; that when this happened everybody was at the "H.E.B."; that when this occurred it was nighttime and everybody was "asleep"; that this happened in "my room"; that she was by herself with appellant on the sofa; and that her mom and dad "were at the beach."

5

R.M.T. recalled a particular time when she and her brothers and sisters were alone with appellant in the living room and the children were playing video games. R.M.T. testified that while appellant was "sitting on the chair" in the living room "he stick his pee-pee out" and "he stuck it back in his pants." Then, R.M.T. testified "he got my sister . . . he grabbed her with his hand . . . he put them on the lap" and "he stuck it out . . . then he . . . stuck it back in his pants." R.M.T. confirmed that appellant "got" both sisters. R.M.T. testified that while on the chair "he sat me on his lap" and his "pee-pee" was "in the middle part."

On cross-examination, R.M.T. admitted that she remembered telling Jimenez at the Children's Advocacy Center that no one had ever touched her butt and that she had never seen someone's "pee-pee" before. On redirect examination, R.M.T. testified that she had seen "Uncle Felix['s] pee-pee." Additionally, R.M.T. divulged that appellant touched and massaged "the pee-pee" in front of her while appellant saw her watching him. R.M.T. described the following: when he massaged "the pee-pee" it changed and got "bigger." When asked what appellant would do to her at night, R.M.T. verbalized "butt" and pointed to that location on the anatomically correct doll. When asked, "did it bleed?" R.M.T. responded "yes."

When recalled to testify, R.M.T. attested that appellant licked "the butt" with his tongue and that he licked the front part; that it felt "hard"; that it hurt; that it occurred with "me and my sisters" in the room; and that it occurred in the living room at night.

On cross-examination, during her recall, R.M.T. testified that the alleged abuse occurred in the same room while her brothers and sisters were present; that her siblings were "at the beach"; that her family left "Uncle Felix" at home with her while they went to

6

the beach; that she was left alone with appellant while the family was at the beach "five times"; that nobody was around at those times; and that "me and my brothers" were there.

## C. Segovia's Testimony

Segovia, the crime victims coordinator for the Bee County district attorney's office, testified that she was the outcry witness for R.M.T. and was present when the district attorney interviewed the three alleged victims. At the interview on May 7, 2008, Segovia stated that "we were just thinking we were going to have the child come in and let us know about one incident that occurred with the Defendant." However, "when R.M.T. came in [she] just came out and started telling us a whole lot more . . . ." Segovia testified she took notes during the interview with R.M.T. and composed the outcry statement. In the interview. R.M.T. "told us that her uncle . . . had put his private part into her tushie." When referring to "her tushie," R.M.T. pointed to the female front of her sexual organ. Segovia recalled that R.M.T. "took the two dolls and showed us that he had put it inside her front tushie." Segovia testified that R.M.T. "went on to tell us that he had licked her . . . on her tushie"; that "it tickled"; "that he had laid her on the couch and she didn't have any clothes on when he did this." Segovia testified that following R.M.T.'s outcry, all of the girls went to Driscoll Hospital for a SANE examination.

## D. S.J.T.'s Testimony

S.J.T. testified that she is eight years old and that appellant "is my uncle." S.J.T. identified the male genitalia on the anatomically correct doll as "the middle" and the behind portion as "the butt." Upon being asked if S.J.T. has "ever seen anybody's middle before,"

S.J.T. responded, "Felix . . . when I was sitting on his lap . . . [in] the living room . . . on the couch." S.J.T. further testified that "he put his middle on my butt."

S.J.T. recalled the particular time when she and her brothers and sisters were alone with appellant in the living room and the children were playing video games. S.J.T. testified that appellant "grab[bed] her hand and pulled her on the lap," and agreed with the statement that "he held you on his lap and he had his private out . . . he was touching your butt." S.J.T. showed the jury with the anatomically correct dolls how she was sitting on appellant's lap, that she was not straddling appellant but facing away from appellant. S.J.T. testified that he held her on his lap for eight seconds "squeezing my hand . . . holding my arms." S.J.T. further testified that appellant tried to put it in her "butt," however it did not go inside her butt—she had on pajamas and panties. S.J.T. attested that when she was on appellant's lap, he told her "be my girlfriend" and "I said no." When asked if she "remember[ed] how he took it out of his pants," S.J.T. responded "yes." Soon after, when asked "did you see him take it out of his pants," S.J.T responded "No." S.J.T. testified that while she was on appellant's lap, she felt it on her and that she is sure it was his private. She also testified that she actually saw his private and that it happened more than once.

S.J.T. described further seeing appellant grab S.B.T. in the living room and sit her on his lap. At first, S.J.T. testified she did not see appellant do anything to R.M.T. Then, S.J.T. modified her statement and said that she did see appellant grab "[R.M.T.] and he tried to sit her on his lap." S.J.T. further explained that her brothers did not see what was happening because they were playing video games. S.J.T. testified that my "sister ran to

8

my Mom's room knocking on the door that Felix was saying—I mean, [R.M.T.] was saying Felix is having sex with me."

S.J.T. testified that she was the first to tell her mom about the alleged abuse; that she "didn't tell nobody" right after she got off appellant's lap; that it was a long time before she told anyone; that she told her mom after appellant left the house; and that the first person she told was "my Mom."

On cross-examination, S.J.T. testified that she remembered talking to Jimenez at Children's Advocacy Center. S.J.T. admitted that some of the things she told him are different than her testimony. S.J.T. remembered telling Jimenez that she never saw appellant's middle or private parts. S.J.T. also confirmed that in her interview, she stated that appellant did not say anything to her and that now she testified that he said, "be my girlfriend." When asked, "which one happened," S.J.T declared, "he said be my girlfriend." S.J.T. agreed that just today, she remembered that R.M.T. ran down the hall, knocked on her mom's door, and that she said that Felix had sex with her.

### E. S.B.T.'s Testimony

S.B.T. testified that she is ten years old, enjoys school, and has two brothers and three sisters. She remembers that appellant was staying at the house "because he didn't have anywhere to stay." S.B.T. testified that while "we were playing games . . . he grabbed me and my sisters, put us on his lap and [it] just didn't feel right." S.B.T. used the anatomically correct dolls to demonstrate how he "sat us on his lap" and had them facing the same way he was facing and was "pushing me front-way and back-way." She did not see his "middle out." She first testified that she could not feel anything on her bottom, that

9

he was pushing "with his hands." Then, S.B.T. explained that she did feel his middle "for a little" touching "on my leg here" and "under."

S.B.T. described the particular time when she and her brothers and sisters were alone with appellant in the living room and the children were playing video games. She recalled that S.J.T. was the first sister he put on his lap and she "saw him moving her . . . ." Then, "he did the same to R.M.T." S.B.T testified that while on appellant's lap, "my little sister [R.M.T.] fell down . . . she was crying so I went to go help her . . . ." In further testimony, she recalled that "my sister [S.J.T] runned . . . tried to go to my mom but the door was locked." She recalled that S.J.T. banged on their mother's door while she tended to her crying sister R.M.T. She also recalled that while she was on appellant's lap, R.M.T banged on their mother's door, and after she got away, they all banged on their mother's door.

S.B.T. testified that she told her mother twice about the incident with appellant. First, on the day after the incident, she testified that she told her mother and "she got mad . . . real mad." She recalled that appellant left the house and that her mom did not tell anybody. S.B.T. testified that she told her mother a second time coming home from a doctor's appointment. "I told her again when we went over there to the—Corpus . . . I told her again." In reference to her mother, S.B.T. stated that "sometimes she forgets stuff."

## F. C.T's Testimony

C.T., the mother of the three alleged victims, testified that she was the outcry witness and a mother of six children. None of her daughters are married. She remembers the girls initially telling her about the alleged incident when "we had went to a doctor's appointment . . . we were waiting to be seen and that's when they had come up to me and

told me." She testified that S.B.T. "came up to me and she told me crying . . . that they were playing their V.Smile [video game] and that he had tried to grab them and put them on his lap . . . and she said she felt very uncomfortable . . . [and] this happened to all of them . . . it was the three girls."

C.T. testified to the contents of the outcry statements her three daughters made to her against appellant. S.B.T. "said that he had took . . . pee-pee out and . . . he had . . . put them on his lap" and told her that she had seen appellant's "pee-pee." S.J.T. "said that Felix [appellant] sat me on his lap and [I] asked her . . . if she saw anything else," and S.J.T. "said, yes, mom . . . he was trying to pull . . . he was trying to put it where my butt was." She then asked S.J.T. if she had any clothes on, and "she said yes." C.T. read the following from her original statement regarding R.M.T.'s initial outcry: "Saturday sometime in the morning R.M.T. came to me to my bed and she just came out and told me Felix is a bad man and he was going to go to hell because he had took his pee-pee out . . . we were playing a game and he was trying to sit me on his lap . . . and she said he took it out, his pee-pee, and was massaging it . . . ."

C.T. testified that when her daughters outcried, appellant was no longer living at their house. After the initial outcry, she called her husband, J.T. "We talked to our families and we told them what we were going to do and then . . . the next day . . . we went to the police department and reported this." C.T. testified she brought them to Captain Caddell "at the police station" and told him what the girls had disclosed. Then, "we had went straight to the Children's Advocacy Center . . . then months later [the] interview with the prosecutor [where R.M.T.] she had another outcry." After "baby [R.M.T's] outcry we went

11

to Corpus Christi . . . the Driscoll Hospital, and they checked the girls from head to toe to make sure that he had not done anything else to them and stuff."

C.T. testified that March 27, 2008, was the first time she heard the allegations. She does not recall the girls talking to her the day after the alleged incident and does not remember the girls ever banging on the bedroom door on a weekend night. She testified that "yes [she] would have" heard the children if they were banging on the bedroom door and that she would have answered and not avoided the situation.

## G. J.T.'s Testimony

J.T. is the father of the three victims and the brother of appellant. He testified that appellant lived with them "I would say about two weeks, maybe three." His wife first told him about the outcry when he was out of town. He "told her to wait" and not to go to the police "until I got down . . . that was like two days later . . . so I could be there." He testified that they had discussed not filing charges because "I wanted to make sure the kids weren't making something up." J.T. testified that "I believed it because they won't lie to me about something like that . . . really they won't lie about something like that, you know, they won't."

J.T. disclosed he was probably home during the time of the alleged abuse. He testified that R.M.T. made an attempt to talk to him before S.B.T. made the initial outcry to C.T. On a Saturday, while appellant "was in the living room with the kids watching TV," he recalled that "my daughter came up to me . . .the smallest one [R.M.T.] and she came up to me . . . I blew it off . . . because . . . I thought she was playing around or something . . . I just blew it off." J.T. stated that her attempt to tell him what had happened occurred "before all of that stuff came out . . . that Saturday I guess." J.T. further testified

12

that he never took the family to the beach while appellant was staying at his home. He agreed that it would not be normal to go to the beach in the month of February. He also attested that he never left R.M.T. at home alone with appellant.

## H. Howell's Testimony

Howell, an inmate incarcerated with appellant awaiting trial for his own felony indictment, testified that appellant admitted guilt. On August 25, 2008, Howell wrote the prosecution a letter "because I felt like I needed to do something . . . ." Howell further testified that appellant "told me that he was guilty and that . . . he told me that it involved three little girls and that the youngest was saying everything . . . ." Howell disclosed that he wrote the letter "because . . . he was talking about children . . . I have two children of my own, and for him to be telling me that he was guilty, it kind of upset me." He also testified that he has not been offered any deal regarding the indictment in his felony case and that "we haven't even discussed it."

## I. Jimenez's Testimony

Jimenez, the lead forensic interviewer for the Children's Advocacy Center, testified regarding his experience with child victims of sexual abuse and his interviews with the three girls. He testified that "last year . . . the center saw 1,741 children" and that he works with sexually abused children regularly. In his experience with child victims of sexual abuse, he testified that "a lot of times children don't disclose fully . . . over time more comes out . . . [an] incremental disclosure . . . we understand that is a natural process, that more comes out."

13

On March 31, 2008, Jimenez interviewed the three alleged victims at the Children's Advocacy Center. He testified specifically as to R.M.T.'s interview. He confirmed that at the beginning of the interview with R.M.T., she told him the following: no one ever touched her bottom; no one ever touched her butt; she had never seen someone's "pee-pee." He further testified, at the end of the interview, when "I asked who is Felix . . . when I asked the question who this person was . . . she elicited [a] response . . . different from the first part . . . she did disclose" that she saw appellant's "pee-pee." Jimenez testified that R.M.T. described appellant's penis; "she said it was big" and "she said to [appellant] put it up." Jimenez testified that R.M.T. never talked to him about penetration or oral sex during the interview.

## J. Eddleman's Testimony

Eddleman, the lead forensic nurse examiner at Driscoll Hospital, testified about the medical records and the results of the SANE examination performed on each of the three children. She testified that notations on the medical records were "made by the person that was getting the medical history from the patient." She testified that on May 13, 2008, the SANE nurse made the following notion on S.B.T.'s medical record:

> When I was nine my Uncle Felix pulled me by the wrist. He put me on his lap. He almost took out middle part. He was doing this. (Patient then demonstrated rocking back and forth, rocking forward and backward motion.) I kicked him and he grabbed my sister S.J.T. My sister tried to get off. He did the same thing to her. He put her on his lap. Another time he took it out and was telling me touch it, touch it. I said, ["]no, I didn't want to.["] So we were just playing with it.

Eddleman testified the SANE nurse wrote the following on S.J.T.'s medical records: "Uncle Felix took out his middle. He stuck it out and put it in here (she indicated her butt by pointing) on my pajamas. It hurt. He told me don't tell anyone he did it, but I told my Mom

14

he did it to me." The SANE nurse wrote the following on R.M.T.'s medical records: "Uncle Felix touched me (she indicated her butt by pointing). He put me on his lap."

As far as the results of the SANE examinations, Eddleman testified "none of the three had any genital trauma" and there was no DNA evidence found. She explained that "eighty percent of the time we don't find any genital trauma," and we know what happened "by what the patient told us." She also disclosed they only "collect DNA if we see the patient within 96 hours or four days." Eddleman testified that in her experience she has seen children with trauma and that on examination two weeks later the trauma is healed. She continued, "that part of the body heals incredibly rapidly [because] that part of the body has the same vasculature, the same blood supply that your mouth does" and like the mouth, "it heals itself without anything left over for us to visualize." Eddleman further testified that in her experience "we know that children . . . test the waters . . . [and] tell what happened in gradual steps, so they tell a bit about what happened to see the reaction of 'am I going to be in trouble.'"

On cross-examination, Eddleman confirmed that R.M.T. never made an outcry of any type of penetration to the SANE nurse. She also confirmed that they found no physical evidence of any trauma or sexual assault besides what the children told the sexual assault nurse examiner. Eddleman agreed that the medical examination provided no physical evidence one way or the other that this occurred or did not occur.

At the conclusion of the evidence, the trial court granted appellant's motion for a direct verdict as to Count 2. The jury found appellant guilty of Counts 1 and 3 through 8. This appeal followed.

## II. STANDARD OF REVIEW & APPLICABLE LAW

When conducting a factual sufficiency review, we consider all of the evidence in a neutral light to determine whether a jury was rationally justified in finding the defendant guilty beyond a reasonable doubt. *Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008). Analysis of a factual sufficiency review is based upon a two pronged approach. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). The court of appeals will set aside the verdict only if: (1) the overwhelming weight of the evidence is so weak as to render the verdict clearly wrong and manifestly unjust, or (2) the jury's verdict is against the great weight and preponderance of the evidence. *Id*. at 415 (citing *Johnson v. State*, 23 S.W.3d 1, 10 (Tex. Crim. App. 2000)). "Although authorized to disagree with the jury's determinations even if probative evidence exists which supports the verdict, a reviewing court must give due deference to the fact finder's determinations concerning the weight and credibility of the evidence and will reverse the fact finder's determination only to arrest the occurrence of a manifest injustice." *Swearingen v. State*, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003); *see also Steadman v. State*, 280 S.W.3d 242, 247 (Tex. Crim. App. 2009); *Grotti*, 273 S.W.3d at 283. In conducting a factual sufficiency review, we are "required to consider the most important evidence that the appellant claims undermines the jury's verdict." *Sims v. State*, 99 S.W.3d 600, 601 (Tex. Crim. App. 2003).

Our review of a factual sufficiency challenge is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Wooley v.* State, 273 S.W.3d 260, 261 (Tex. Crim. App. 2008); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge would be one that accurately sets out the law, is authorized by the

indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

As to Count 1 (aggravated sexual assault of a child), a hypothetically correct jury charge would ask the jury if the State proved that appellant: (1) on or about February 27, 2008; (2) intentionally or knowingly; (3) caused the penetration of R.M.T.'s sexual organ by appellant's mouth; and (4) R.M.T. was then a child under six years old. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(iii). As to Count 3 (indecency with a child by contact), a hypothetically correct jury charge would ask if the State proved that appellant: (1) on or about February 16, 2008; (2) intentionally or knowingly; (3) engaged in sexual contact with S.B.T. by touching her anus; (4) with the intent to arouse or gratify his sexual desire; and (5) S.B.T. was then a child younger than seventeen years old and not appellant's spouse. *See Id*. § 22.11(a)(1), (c)(1). As to Count 4 (indecency with a child by contact), such a charge would ask if appellant: (1) on or about February 16, 2008; (2) intentionally or knowingly; (3) engaged in sexual contact with S.J.T. by touching her anus; (4) with the intent to arouse or gratify his sexual desire; and (5) S.J.T. was then a child younger than seventeen years old and not his spouse. *See id*. As to Count 5 (indecency with a child by contact), such a charge would ask if appellant: (1) on or about February 16, 2008; (2) intentionally or knowingly; (3) engaged in sexual contact with R.M.T. by touching her anus; (4) with the intent to arouse or gratify his sexual desire; and (5) R.M.T. was then a child younger than seventeen years old and not his spouse. *See id*. As to Count 6 (indecency with a child by exposure), a hypothetically correct jury charge would ask the jury if the State

17

proved that appellant: (1) on or about February 16, 2008; (2) intentionally or knowingly; (3) exposed his genitals; (4) knowing that S.B.T. was present; (5) with the intent to arouse or gratify his sexual desire; and (6) S.B.T. was then a child younger than seventeen years old and not his spouse. *See Id*. § 21.11(a)(2)(A). As to Count 7 (indecency with a child by exposure), such a charge would ask if appellant: (1) on or about February 16, 2008; (2) intentionally or knowingly; (3) exposed his genitals; (4) knowing that S.J.T. was present; (5) with the intent to arouse or gratify his sexual desire; and (6) S.J.T. was then a child younger than seventeen years old and not his spouse. *See id*. As to Count 8 (indecency with a child by exposure), such a charge would ask if appellant: (1) on or about February 16, 2008; (2) intentionally or knowingly; (3) exposed his genitals; (4) knowing R.M.T. was present; (5) with the intent to arouse or gratify his sexual desire; and (6) R.M.T. was then a child younger than seventeen years old and not his spouse. *See id*.

"The testimony of a child sexual abuse victim alone is sufficient to support a conviction for indecency with a child or aggravated sexual assault." *Soto v. State*, 267 S.W.3d 327, 322 (Tex. App.–Corpus Christi 2008, no pet.). The courts will give wide latitude to testimony given by child victims of sexual abuse. *Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990) (en banc). The victim's description of what happened need not be precise, and the child is not expected to communicate with the same level of sophistication as an adult. *Soto*, 267 S.W.3d at 322. Furthermore, corroboration of the victim's testimony by medical or physical evidence is not required. *Id*. at 332; *Ozuna v. State*, 199 S.W.3d 301, 606 (Tex. App.–Corpus Christi 2006, no pet.). In addition, "outcry testimony alone can be sufficient to sustain a conviction for aggravated sexual assault."

*Ozuna,* 199 S.W.3d at 606 (citing *Rodriguez v. State*, 819 S.W.2d 871, 873-74 (Tex. Crim. App. 1991)).

The State is not required to present direct evidence, such as eyewitness testimony, to establish guilt. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Circumstantial evidence is as probative as the direct evidence in establishing guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Guevara*, 152 S.W.3d at 49. The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *see Guevara*, 152 S.W.3d at 49. In regard to contradictory witness testimony, even when contradicting evidence is compelling, the court must give deference to the fact-finder's decision, unless the record clearly reveals an appropriate contrary result. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

### III. DISCUSSION

In his only issue on appeal, appellant contends that the evidence is factually insufficient to support his convictions because the witness statements made by the three alleged victims were uncorroborated and contradictory . Specifically, appellant argues that, based on the evidence adduced at the trial, a jury could not be rationally justified in finding him guilty beyond a reasonable doubt, and that the fact-finder's decision of guilt is clearly morally wrong and unjust. The State asserts, without conceding the question as to whether or not the testimony of the three alleged victims was corroborated, that the testimony of a

19

child victim alone is sufficient to support a conviction. Furthermore, the State argues that appellant has not shown that the evidence is factually insufficient.

R.M.T. testified that at the time of the alleged incidents, she was four years old. She stated that appellant "sat me on his lap . . . [stuck] his pee-pee out" and "put his pee-pee . . . in the middle part." She also recalled that appellant "got" both of her sisters and "put them on his lap . . . stuck it out . . . stuck it back in his pants." Additionally, R.M.T. attested that appellant "massaged . . . the pee-pee" in front of her and it got "bigger." In further testimony, R.M.T. alleged a second incident where appellant licked "the butt" and her vagina. S.J.T. testified that at the time of the alleged incidents, she was seven years old. S.J.T. recalled seeing appellant's penis and that while on his lap he put his "middle on [her] butt" and he tried to put it in her "butt." She further explained that she witnessed appellant grab each of her sisters and place them on his lap. S.B.T. testified that she was nine years old at the time of the alleged incidents. In S.B.T.'s testimony, she recalled that appellant grabbed her and her sisters and put them each on his lap in the living room as her brothers played video games. She demonstrated with anatomically correct dolls how appellant pushed her "front-way and back-way" while she was on his lap. S.B.T. further attested that she felt his "middle" touching on her leg, but did not see his "middle."

Appellant argues that the evidence is factually insufficient to support a finding of guilt because the decision is based on contradictory and uncorroborated testimony of the three alleged minor victims. We disagree. As previously noted, in sexual abuse cases involving a child, the testimony of the victim alone is sufficient to support a conviction, and the victim's description need not be at the same level of sophistication as an adult. *See Soto*, 267 S.W.3d at 322; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.07 (Vernon 2005).

20

Furthermore, as noted previously, the victim's testimony does not need to be corroborated by eyewitnesses or physical medical evidence.  *See Soto,* 267 S.W.3d at 322.  In addition, outcry testimony can be enough to support a conviction for aggravated sexual assault of a child.  *See Ozuna*, 199 S.W.3d at 606.

Moreover, we believe that ample other testimonial evidence was presented at trial to support the jury's decision.  The allegations by the three alleged victims were made on repeated occasions and to multiple individuals.  Their mother, C.T., testified that on March 27, 2008, S.B.T. made the initial outcry, followed by S.J.T.'s disclosure about appellant.  C.T. further recalled that on March 29, 2008, R.M.T. first confirmed the initial outcry and "told me Felix is a bad man and going to hell because he had took his pee-pee out . . . and was massaging it."  Jimenez testified that on March 31, 2008, in R.M.T.'s interview at the Children's Advocacy Center, she disclosed that she saw appellant's penis and described it as "big."  Further, Segovia testified that on May 7, 2008, R.M.T. made an additional outcry that appellant "put his private in her tushie" and performed oral sex "on her tushie."  Eddleman testified that before the victims' SANE examinations on May 13, 2008, they each repeated the allegations to the nurse examiner who wrote their disclosures on the medical records.  Eddleman explained that no DNA evidence was found because they only "collect DNA evidence if we see the patient within ninety-six hours" of the alleged abuse.  In addition to the three victims' testimony and their repeated allegations, Howell testified that appellant admitted his guilt to him and further disclosed "that it involved three little girls and that the youngest [R.M.T.] was saying everything . . . ."

We do note some contradictory statements made by the three victims.  *See Sims*, 99 S.W.3d at 601 (requiring the reviewing court to consider the evidence that appellant

21

claims most undermines the verdict). R.M.T.'s testimony varied as to who was present when the alleged abuse occurred. She testified that when the alleged abuse occurred that "nobody else" was there except "Mom and Dad"; that it occurred in the same room while her brothers were present; that she was alone and everyone was at the "H.E.B."; that it happened in "my room"; that it occurred while everyone was "at the beach"; and that her family left her alone with appellant "five times" while they were "at the beach."

S.J.T.'s testimony is, at times, similarly contradictory as to whether she actually saw appellant's penis. S.J.T. responded "yes" when asked if she "remember[s] how" appellant took his penis "out of his pants." Shortly thereafter, S.J.T. contradicted her testimony by responding "no" when asked if she saw "him take it out of his pants." In continued testimony, S.J.T. clarified and said that, "yes," she actually saw appellant's penis. S.J.T. provided further contradictory testimony when she testified that she did not see appellant do anything to R.M.T., only to later state that she saw appellant grab "[R.M.T.] and he tried to sit her on his lap." On cross-examination, S.J.T. admitted to inconsistencies between her statements made in testimony and the ones she made on March 31, 2008, in her interview with Jimenez at the Children's Advocacy Center. S.J.T. admitted she told Jimenez she never saw appellant's private parts and now she testified that she did see appellant's penis. S.J.T. further conceded that in the interview with Jimenez, she said that appellant did not say anything to her and now she testified that "he said be my girlfriend." In addition, S.J.T. agreed that during her testimony it was the first time she remembered that her "sister ran to my Mom's room knocking on the door that Felix was saying—I mean [R.M.T.] was saying Felix is having sex with me." C.T. testified that she does not recall a time when the girls ever banged on her bedroom door and that she would have answered

22

the door if she had heard such banging.  Additionally, S.J.T testified that she was the first sister to tell her mother about the alleged abuse.  However, C.T. testified that S.B.T. was the first to tell her about the allegations.

S.B.T.'s testimony varied as to whether she actually felt anything on her bottom when appellant allegedly had her in his lap.  At first, S.B.T. testified that she only felt appellant pushing her "with his hands" and could not feel anything on her bottom.  S.B.T. later modified her statement and explained that she felt his penis touching her bottom "for a little. . . . [o]n my leg here . . . [and] under."  In addition, S.B.T. testified that all three of her sisters banged on her mother's door, thus contradicting C.T.'s testimony.

Even in light of the apparent inconsistencies and contradictory testimony of the three child victims, we note that it was within the realm of the fact finder to judge the credibility of the witnesses and decide the weight to be given to the various testimonies.  *See* TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007); *Swearingen*, 101 S.W.3d at 97.  As noted previously, we give deference to the jury's determination on contradictory witness testimony, unless the record clearly reveals an appropriate contrary result—which is not the case here.  *Lancon*, 253 S.W.3d at 705.  Viewing the evidence in a neutral light, we cannot conclude that the jury's verdict was clearly wrong, manifestly unjust or against the great weight and preponderance of the evidence.  *See Watson*, 204 S.W.3d at 414-15; *Grotti*, 273 S.W.3d at 283.  We, thus, conclude the evidence is factually sufficient to support the jury's verdicts.  Appellant's sole issue is overruled.

### IV. MODIFICATION OF THE JUDGMENT

The Texas Rules of Appellate Procedure give this Court authority to modify judgments to correct errors and make the record speak the truth.  *See* TEX. R. APP. P. 43.2;

23

*French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992) (en banc); *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.–Texarkana 2009, no pet.); *Gray v. State*, 628 S.W.2d 228, 233 (Tex. App.–Corpus Christi 1982, pet. ref'd). Appellant was indicted on eight counts: sexual assault of a child (Counts 1-2); indecency with a child by contact (Counts 3-5); and indecency with a child by exposure (Counts 6-8). As previously noted, a verdict of not guilty was returned on Count 2 as a result of the trial court's granting of a motion for a directed verdict. The jury found appellant guilty of the remaining seven counts.

Each count of conviction was subject to an enhancement for appellant's prior felony conviction for unauthorized use of a motor vehicle. Thus, Count 1, a first-degree felony, was punishable by twenty-five to ninety-nine years in prison. *See* TEX. PENAL CODE ANN. § 22.021(e), (f)(1) (providing that sexual assault of a child is a first-degree felony that is punishable by a minimum of twenty-five years' imprisonment if the victim is younger than six years of age at the time of the offense); § 12.42(c)(1) (Vernon Supp. 2009) (providing that if it is shown on the trial of a first-degree felony that the defendant was previously convicted of a felony, the range of punishment is fifteen to ninety-nine years incarceration in the ID-TDCJ). Counts 3 through 5, second-degree felonies, were raised to first-degree felonies and were punishable by fifteen to ninety-nine years in prison. *See id.* §§ 12.42(b), (c)(1), 21.11(a)(1), (d). Counts 6 through 8, third-degree felonies, were raised to second-degree felonies and were punishable by two to twenty years in prison. *See id.* § 12.33(a) (Vernon Supp. 2009); § 21.11(a)(2), (d). All seven counts were subject to a $10,000 maximum fine. *See id.* §§ 12.33(b), 12.42(c)(1).

However, the trial court's judgment of conviction reflects, in error, that all counts are first-degree felonies with an applicable punishment range of fifteen to ninety-nine years'

or life imprisonment.[3]  Therefore, we modify the trial court's judgment to describe Count 1 as a first-degree felony with an applicable punishment range of twenty-five to ninety-nine years' imprisonment; Counts 3 through 5 as first-degree felonies with an applicable punishment range of fifteen to ninety-nine years' imprisonment; and Counts 6 through 8 as second-degree felonies with an applicable punishment range of two to twenty years' imprisonment.[4]

## V. Conclusion

We affirm the judgment as modified.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
15th day of July, 2010.

---

[3]The judgment correctly reflects that all counts were subject to a maximum fine of $10,000.

[4]We note that the trial court sentenced appellant within the correct applicable punishment ranges: forty years' imprisonment for Count 1; twenty years' imprisonment each for Counts 3 through 5; and fifteen years' imprisonment each for Counts 6 through 8.  No fine was imposed, and the sentences were ordered to run concurrently.