

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-10-00002-CR

_____

WILLIAM LEE SMARR, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th Judicial District Court
Upshur County, Texas
Trial Court No. 15,237

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

No doubt, William Lee Smarr had ingested a mix of legal prescription medications[1] before he attempted to drive his three children home after a day-long fishing trip, ultimately resulting in a jury deciding that Smarr was guilty of DWI, with child passengers, and assessing a sentence of fifteen months' confinement. The trial court sentenced Smarr consistent with the jury's assessment. The questions before us on Smarr's appeal concern the sufficiency of the evidence to prove that Smarr drove without his normal mental or physical faculties because he had ingested medications. Because we determine that the evidence was legally and factually sufficient, we affirm the judgment of the trial court.

As the Smarr vehicle approached Smarr's house, its erratic movements suggested Smarr's distress. First, the vehicle stopped in the middle of the road with its motor running. Then, with Smarr apparently unconscious or semiconscious, the vehicle began moving forward. When Smarr did not respond to his children's calls, and the vehicle passed Smarr's driveway, one quick-thinking son got down on the floorboard and held Smarr's foot on the brake pedal while the other quick-thinking son steered the vehicle off the road.

By the time the police arrived, Candace Smarr, the children's mother and Smarr's ex-wife, had taken the children to their residence located "right back up the road" and had returned to the scene. Ms. Smarr told the police that Smarr had taken too much medication. Smarr was

---

[1]The medications had been prescribed to treat Smarr's pain caused by "a herniated disc in his neck and low back," as well as a crush injury to his foot.

transported to a local hospital in an ambulance and was diagnosed as suffering from an overdose of prescription medication. Approximately nine days later, Smarr was diagnosed as suffering from mild hypoglycemia (low blood sugar).

On appeal, Smarr argues the evidence is legally and factually insufficient to support the jury's verdict. The State was required to prove that Smarr did not have "normal use of mental or physical faculties by reason of the introduction of . . . a drug . . . into the body." *See* TEX. PENAL CODE ANN. §§ 49.01, 49.04 (Vernon 2003), § 49.045 (Vernon Supp. 2009). Smarr's argument is limited to whether he was intoxicated by reason of the introduction of a drug. Smarr points out that the police and medical personnel at the hospital never bothered to look for any cause of Smarr's impairment other than the one suggested by Smarr's recently divorced wife—an overdose of medication. According to Smarr, his conviction is the result of this myopia. Smarr posits that the evidence establishes reasonable doubt that his condition was caused by the introduction of a drug into his body, rather than the result of hypoglycemia compounded by dehydration.

In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We must give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing

3

*Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)).

In conducting a factual sufficiency review, we consider the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006). We may find evidence factually insufficient in two ways: (1) the evidence supporting the conviction is "too weak" to support the fact-finder's verdict, or (2) considering conflicting evidence, the fact-finder's verdict is against the great weight and preponderance of the evidence. *Laster*, 275 S.W.3d at 518. Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *see also Grotti v. State*, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008).

David Cruze, a deputy with the Upshur County Sheriff's Office, testified that, at the scene, Smarr had "difficulty maintaining his balance":

> As I asked him to walk back to my car, he was stumbling, he had to grab onto the side of the truck to keep his - - to keep his balance, and as we got to the back of the truck, past the back of his vehicle, I was walking to his right, he just fell to the left and started stumbling real hard to the [l]eft and I had to actually grab him by his arm to keep him from falling down, which he would have.

Smarr informed Cruze he had not had anything to drink, but had taken his medication. Cruze did not smell any odor of alcohol on Smarr and did not find any alcohol in the vehicle.

Wes Whalen, a paramedic for the East Texas Medical Center, testified that, at the scene, Smarr's speech was slurred and he appeared to be intoxicated. Whalen testified that Smarr told him he had ingested a morphine tablet and that Smarr's vehicle contained prescription bottles of

Alprazolam (Xanax), Soma, and Norco. Smarr had been prescribed a sustained-release form of morphine referred to in the record as MS-Contin. Whalen testified he performed a test for blood sugar, referred to as a D-stick, at the scene, but did not know the results. Whalen testified that a saline solution was administered to Smarr intravenously.

At the hospital, Smarr was examined by Dr. Brian Kempton, an emergency physician. When Kempton first examined Smarr, Smarr had slurred speech, responded slowly to questions, and appeared lethargic. Kempton testified that Smarr seemed not to understand he was lethargic and concluded Smarr's "insight into what was going on seemed impaired." The hospital took a sample of Smarr's blood approximately thirty-three minutes after Kempton's first visit. Kempton testified that Smarr's blood did not contain detectable levels of alcohol. Smarr's blood tested positive for opiates and benzodiazepine, but the quantity of those substances was not determined. Smarr denied taking an overdose of his medication. Two of Smarr's prescribed drugs, MS-Contin, which is a sustained-release form of morphine, and Norco, which is a form of hydrocodone, would "show up positive as opiates" in a blood test. The Xanax prescribed to Smarr is a benzodiazepine. When asked if a person could be intoxicated on a mixture of "Soma, Norco, Xanax, morphine, even if they were within therapeutic levels," Dr. Kempton responded, "I'd say there's a significant interaction among those that would -- I think anybody who took that would be intoxicated." When asked if anything in his report would lead him to believe Smarr was in hypoglycemic shock, Kempton responded, "Nothing here . . . Normal people don't get

hypoglycemic. I mean, that just is vanishingly rare." Kempton testified his notes do not indicate a result for the D-stick test for Smarr's blood-sugar level, but also testified EMS personnel normally check a patient's blood-sugar level. Kempton diagnosed Smarr as suffering from a drug overdose and testified it was "pretty obvious that [Smarr] was heavily intoxicated on multiple substances." Kempton testified that he treated Smarr for only forty minutes and that his interaction with Smarr was pretty limited.

Just minutes after the blood sample was drawn, there was a shift change at the hospital. Dr. David Buller, a physician who has a family practice and also works as an ER physician at the hospital, came on duty. By a coincidence, Buller was Smarr's family physician. At the hospital, Buller diagnosed Smarr as suffering from a drug overdose. Buller did not order any additional testing at the hospital, and Smarr was discharged from the hospital approximately forty-four minutes after Buller came on duty. Buller, though, was surprised at Smarr's quick recovery and testified he "would not expect a drug overdose to cure that rapidly."[2] Buller testified Smarr had been a patient of his for more than five years and was taking the medications before becoming his patient. Buller testified that, if the medications had been taken as prescribed, Smarr would have been safe to drive a motor vehicle. Approximately nine days after Smarr's hospital visit, Buller conducted a glucose tolerance test on Smarr and diagnosed Smarr with mild hypoglycemia.[3] The

---

[2]Kempton agreed MS-Contin would "wear off slowly."

[3]The State argues that glucose tolerance test performed by Buller "showed Smarr's glucose levels to be within the normal range" and, therefore, "does not even contradict the jury's verdict." The State's argument suggests that

6

results of the glucose tolerance test caused Buller to revise his diagnosis and to conclude that Smarr's condition was the result of multiple factors including hypoglycemia, dehydration,[4] and the medications. Buller testified, "[T]here are -- I believe are multiple factors involved, hypoglycemia could be a possibility, drinking Monster drinks which he admitted to could be a contributing factor in addition to taking his regular dose of medication." Buller admitted that Smarr's blood test at the hospital indicated a glucose level of 97, a normal level. Buller testified that Smarr's body could have corrected the blood-sugar level in the hour between the arrest and the blood test through "a process of glucogensis" where "the body would recognize the sugar is low" and "would take protein and fat and convert it back into sugar, raise the blood sugar back up to a level that the body likes."[5] The State cross-examined Buller:

> Q.     . . . in an hour and 41 minutes you're telling me it's normal for you to raise your glucose level that high?
>
> A.     That's not what I said.
>
> Q.     It's not normal, is it?

Buller's diagnosis is incorrect and, therefore, does not contradict the jury's verdict. We have no doubt that the diagnosis of hypoglycemia is more complicated than merely comparing the test results to the ranges preprinted on the test result form. Buller admitted the glucose levels were within the ranges which might be considered normal, but testified the variances in the blood-sugar levels led him to conclude Smarr was hypoglycemic. We are not medical doctors, and it is not our role to determine whether Buller's diagnosis was correct. The State did not present any expert testimony that Buller's analysis of the glucose tolerance test was incorrect.

[4]Buller testified that Smarr reported fishing all day without eating, but while drinking Monster drinks on "a pretty warm day." Buller opined that, therefore, Smarr was probably "a little dehydrated as well."

[5]Kempton testified that a person who was suffering from hypoglycemic shock would recover only if "we intervened some way," such as giving him "glucose or even an IV of glucose." Kempton testified that the chart did not indicate any fluids were administered to Smarr. However, as noted above, Whalen testified that a saline solution was administered intravenously.

7

A.     That's not what I said.

Q.     Okay.   Is that normal?

A.     Unlikely.

Q.     Unlikely.

A.     Uh-huh, to go that big a distance.   That's why my opinion is more than one thing involved.

When asked, "Can you say with any medical probability that he was in the condition he was due to a drug overdose on that day," Buller responded, "I cannot."

The State limits its appellate argument to whether the evidence is sufficient to show that Smarr took an overdose of his prescription medication.   The State, though, was not required to prove Smarr took an overdose.   The fact that a defendant was entitled to use prescribed medication is not a defense to DWI.   *See* TEX. PENAL CODE ANN. § 49.10 (Vernon Supp. 2009). "[A] person may drive after taking a prescription medication so long as that person has not lost the normal use of his mental or physical faculties by reason of introduction of the prescription drug into his body."   *Paschall v. State*, 285 S.W.3d 166, 178 (Tex. App.—Fort Worth 2009, pet. ref'd). Thus, our review is not concerned with whether the evidence supports a conclusion that Smarr took more medication than prescribed.   The question, rather, is whether the evidence supports a conclusion that Smarr's impaired condition resulted from ingesting prescription drugs, regardless

8

of the amount.[6]

A rational person could have concluded that, beyond a reasonable doubt, Smarr was guilty. The jury could have chosen to believe Kempton's diagnosis over the diagnosis of Buller. Kempton testified the prescription drugs could have caused Smarr to be intoxicated even if taken at therapeutic levels and, in his opinion, Smarr's condition was the result of Smarr's prescription drugs. The jury could have rejected Buller's testimony. The evidence is legally sufficient.

The next question is whether the evidence is factually sufficient to support the jury's verdict. Buller testified Smarr's hypoglycemia and dehydration may have contributed to Smarr's condition. We note that "a defendant cannot be found to be intoxicated if he lacks the normal use of mental or physical faculties for a different reason, such as disability, illness, fatigue, stress, or clumsiness." *Hernandez v. State*, 107 S.W.3d 41, 51 (Tex. App.—San Antonio 2003, pet. ref'd); *see Drapkin v. State*, 781 S.W.2d 710, 711 (Tex. App.—Texarkana 1989, pet. ref'd) ("Fatigue is not an affirmative defense. It is an alternative cause."); *Massie v. State*, 744 S.W.2d 314, 316 (Tex. App.—Dallas 1988, pet. ref'd); *cf. Atkins v. State*, 990 S.W.2d 763, 767 (Tex. App.—Austin 1999, pet. ref'd) (error to give instruction on synergistic effect of fatigue and alcohol).

In a factual sufficiency review, however, we may find the evidence insufficient only when necessary to prevent manifest injustice. *Laster*, 275 S.W.3d at 518. Although we give less

---

[6]We are not suggesting the amount of drugs in Smarr's body is not relevant to the inquiry of whether Smarr's condition was caused by the prescription drugs. Buller testified a quantitative test could have been conducted. A quantitative analysis would have greatly strengthened the State's case. However, the State did not perform any tests to determine the quantity of the prescribed medication in Smarr's blood. While such a quantitative analysis would have strengthened the State's case, such an analysis is not required.

deference to the verdict in a factual sufficiency review, we will not override the verdict simply because we disagree with it. *Id.* Buller testified merely that Smarr's hypoglycemia was a factor in causing the condition. According to Buller, the condition was caused by multiple factors, including hypoglycemia, dehydration, and the prescribed medications, acting together. Thus, Buller's testimony does not establish that hypoglycemia and dehydration caused Smarr's impairment by themselves, or conversely that the drugs did not cause it. Even according to Buller, the prescribed medication still played a role in Smarr's condition. The overwhelming great weight and preponderance of the evidence does not dictate a finding against Smarr's drug ingestion causing his impairment. Nor is the evidence of medication-caused impairment so weak that the State failed to establish Smarr's guilt beyond a reasonable doubt. Our skepticism about the jury's conclusion is not sufficient to reach the high level required to reverse a jury's verdict. The evidence is factually sufficient.

For the reasons stated, we affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice


Date Submitted:     September 7, 2010
Date Decided:       September 10, 2010

Do Not Publish

10